Morgan Chu (Bar No. 70446)
mchu@irell.com
Gary N. Frischling (Bar No. 130583)
gfrischling@irell.com
Amy E. Proctor (Bar No. 283845)
aproctor@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:    (310) 203-7199

*Attorneys for*
Vestas Wind Systems A/S and
Vestas-American Wind Technology,
Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENERAL ELECTRIC CO., | Case No. 2:17-cv-05653-AB-PLA |
| Plaintiff, | **ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT AND AMENDED COUNTERCLAIMS BY VESTAS WIND SYSTEMS A/S AND VESTAS-AMERICAN WIND TECHNOLOGY, INC.** |
| vs. | |
| VESTAS WIND SYSTEMS A/S AND VESTAS-AMERICAN WIND TECHNOLOGY, INC., | |
| Defendant. | **DEMAND FOR JURY TRIAL** |
| VESTAS WIND SYSTEMS A/S AND VESTAS-AMERICAN WIND TECHNOLOGY, INC., | |
| Counterclaimant, | |
| vs. | |
| GENERAL ELECTRIC CO., | |
| Counter-defendant. | |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10421227

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

## ANSWER OF VESTAS WIND SYSTEMS AND VESTAS-AMERICAN TO GE'S SECOND AMENDED COMPLAINT

Vestas Wind Systems A/S ("Vestas Wind Systems") and Vestas-American Wind Technology, Inc. ("Vestas-American") (collectively, "Vestas") hereby answer the Second Amended Complaint ("SAC") of Plaintiff General Electric Co. ("GE") as set forth below.  For ease of reference, the paragraph numbers used herein conform to those recited in the SAC.  The headings used in the SAC are also included herein for convenience only; their inclusion is not intended as an express or implied admission of any facts.  Except as expressly admitted herein, Vestas denies each and every allegation in the SAC.

## NATURE OF THE ACTION

1.      Vestas admits that the SAC purports to state an action arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

2.      Vestas admits that GE has accused Vestas of infringing certain claims of U.S. Patent Nos. 6,921,985 ("the '985 patent") and 7,629,705 ("the '705 patent"). Vestas otherwise denies the allegations of paragraph 2 of the SAC.

3.      Vestas admits that GE claims to be the legal owner by assignment of the '985 and '705 patents.  Vestas admits that GE seeks damages and/or injunctive relief, but denies that there is any factual or legal basis for those remedies, and further denies that GE is entitled to any relief whatsoever.  Vestas otherwise denies the allegations of paragraph 3 of the SAC.

## THE PARTIES

4.      Vestas admits that Plaintiff GE is a corporation that is organized and exists under the laws of the State of New York.  Vestas lacks sufficient knowledge or information to form a belief regarding the remaining allegations of paragraph 4 of the SAC, and on that basis denies them.

5.      Vestas admits that Vestas Wind Systems is a corporation organized under the laws of Denmark, having its headquarters and principal place of business

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 2 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1   at Hedeager 42, 8200 Aarhus N, Denmark.  The remaining allegations of paragraph
2   5 of the SAC assert legal conclusions to which no response is required.  To the
3   extent a response is determined to be required as to any factual allegations, Vestas
4   admits that Vestas Wind Systems has subsidiaries, some of which are incorporated
5   in the United States, and otherwise denies the allegations of paragraph 5 of the SAC.

6         6.     Vestas admits that Vestas-American is a wholly-owned subsidiary of
7   Vestas America Holding, Inc., which is a wholly-owned subsidiary of Vestas
8   Americas A/S.  Vestas Americas A/S is a wholly-owned subsidiary of Vestas Wind
9   Systems.  Vestas admits that Vestas-American is organized under the laws of
10  California, and has its headquarters and a principal place of business at 1417 NW
11  Everett St., Portland, Oregon 97209.  Vestas admits that Vestas-American's business
12  includes selling and servicing variable speed wind turbines in the United States, but
13  otherwise denies the allegations of paragraph 6 of the SAC.

14        7.     Vestas admits that the Vestas website states that "Vestas has offices in
15  24 countries and five strong regional sales business units in Northern Europe,
16  Central Europe, Americas, Mediterranean, and Asia Pacific & China," and that
17  "Vestas' organization is structured on seven key pillars representing all key
18  disciplines of the company and all employees.  These seven key pillars are headed
19  by the nine members of the Executive Committee."  Vestas also admits that the 2016
20  Annual Report of Vestas Wind Systems refers to Vestas Wind Systems and its
21  subsidiaries collectively as "The Vestas Group"; identifies the separate legal entities
22  that constitute the Group and lists Vestas-American, for example, as a "[s]ales and
23  service" unit with "[p]lace of registered office" in the U.S.; and provides the
24  consolidated financials of Vestas Wind Systems and its subsidiaries in accordance
25  with the Danish Financial Statements Act (Denmark GAAP).  Vestas further admits
26  that Vestas Wind Systems has released official company announcements describing
27  "firm and unconditional" wind turbine orders, including U.S. orders received by
28  Vestas-American, in compliance with its obligations as a listed company on Nasdaq

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 3 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

Copenhagen.  These company announcements contain contact details for particular individuals employed by Vestas Wind Systems.  The remaining allegations of paragraph 7 of the SAC assert legal conclusions to which no response is required.

## JURISDICTION AND VENUE

8.     The allegations of paragraph 8 of the SAC assert legal conclusions to which no response is required.

9.     Vestas admits that Vestas-American is incorporated and does business in the State of California, and that it is involved in the sale of variable speed wind turbines.  Vestas admits that Vestas-American has sold wind turbines at the San Gorgonio, Brookfield, Alta II-IX, and Solano III Wind Farms.  The remaining allegations of paragraph 9 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

10.     The allegations of paragraph 10 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas admits that Vestas Wind Systems released Company Announcement No. 1/2016 on January 16, 2016 describing a "15-year extension to a service agreement for" the Alta II, III, IV, and V wind farms in Mojave, California, and otherwise denies the allegations of paragraph 10 of the SAC.

11.     The allegations of paragraph 11 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required to any factual allegations, Vestas admits that Vestas-American is incorporated in the State of California and that Vestas Wind Systems does not reside in the United States, and denies the remaining allegations of paragraph 11 of the SAC.

## GE'S ASSERTED PATENTS

12.     Vestas admits that a document that appears to be a copy of the '705 patent is attached as Exhibit A to the SAC.  Vestas admits that the '705 patent

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 4 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

indicates on its face that it was issued on December 8, 2009 and is titled "Method and Apparatus for Operating Electrical Machines."   Vestas otherwise denies the allegations of paragraph 12 of the SAC.

13.   Vestas admits that the '705 patent lists Sidney A. Barker, Anthony Klodowski, John D'Atre, Einar Larsen, and Goran Drobnjak as named inventors.

14.   The allegations of paragraph 14 of the SAC assert legal conclusions to which no response is required.   To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 14 of the SAC.

15.   Vestas admits on information and belief that *General Electric Co. v. Mitsubishi Heavy Industries Ltd.*, No. 3:10-cv-00276 (N.D. Tex.) ("the *MHI* litigation") was litigated in the United States District Court for the Northern District of Texas between GE and Mitsubishi Heavy Industries, Ltd. and Mitsubishi Power Systems America, Inc. (collectively, "Mitsubishi"), and that GE asserted that Mitsubishi's wind turbines infringed claim 1 of the '705 patent.   Vestas admits on information and belief that a jury trial was held in February-March 2012 and a bench trial was held in October 2012, and that the *MHI* court entered judgment denying Mitsubishi's inequitable conduct claims and awarding GE damages and an injunction in accordance with the jury trial verdict.   Despite denying Mitsubishi's inequitable conduct claims, on the basis of a requirement for "smoking gun" evidence that has been rejected by subsequent Federal Circuit cases, the *MHI* court concluded that five GE employees knowingly withheld prior art and prior public uses that were but-for material to at least claim 1 of the '705 patent.   Vestas admits on information and belief that Mitsubishi and GE reached a settlement in December 2013.   Vestas lacks sufficient knowledge or information to form a belief regarding the remaining allegations in paragraph 15 of the SAC, and on that basis denies them.

16.   Vestas admits on information and belief that Mitsubishi filed a request for *inter partes* reexamination of claims 1-9, 13, and 14 of the '705 patent on May

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 5 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

24, 2011 (Control No. 95/000,633), that the reexamination with respect to claims 1-6 was dismissed on September 9, 2014 under 35 U.S.C. § 317(b), and that a document that appears to be the August 17, 2016 *inter partes* reexamination certificate is attached as Exhibit B to the SAC.  Vestas admits on information and belief that Mitsubishi filed a request for *ex parte* reexamination of claim 1 of the '705 patent on September 14, 2012 (Control No. 90/012,587), and that a document that appears to be the July 12, 2013 *ex parte* reexamination certificate is attached as Exhibit C to the SAC.  Vestas admits on information and belief that Mitsubishi filed a request for *ex parte* reexamination of claim 1 of the '705 patent on March 24, 2013 (Control No. 90/012,880), and that a document that appears to be the April 24, 2014 *ex parte* reexamination certificate is attached as Exhibit D to the SAC.  Vestas otherwise denies the allegations of paragraph 16 of the SAC.

17.     Vestas denies the allegations of paragraph 17 of the SAC.

18.     Vestas admits that a document that appears to be a copy of the '985 patent is attached as Exhibit E to the SAC.  Vestas admits that the '985 patent indicates on its face that it was issued on July 26, 2005 and is titled "Low Voltage Ride Through for Wind Turbine Generators."   Vestas otherwise denies the allegations of paragraph 18 of the SAC.

19.     Vestas admits that the '985 patent lists Wilhelm Janssen, Henning Luetze, Andreas Buecker, Till Hoffmann, and Ralf Hagedorn as named inventors.

20.     The allegations of paragraph 20 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 20 of the SAC.

21.     Vestas admits on information and belief that GE filed a complaint against Mitsubishi on February 27, 2008 in the United States International Trade Commission (Inv. No. 337-TA-641), asserting a Section 337 violation based on Mitsubishi's alleged infringement of certain claims of the '985 patent.  Vestas admits

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 6 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

on information and belief that Mitsubishi and GE reached a settlement in December 2013.  Vestas otherwise lacks sufficient knowledge or information to form a belief regarding the allegations of paragraph 21 of the SAC, and on that basis denies them.

22.     Vestas admits on information and belief that Mitsubishi filed a request for *inter partes* reexamination of claims 1-45 of the '985 patent on October 22, 2010 (Control No. 95/000,580).  Vestas admits on information and belief that an *inter partes* reexamination certificate was issued on January 8, 2016 after significant amendment of the claims, and that a document that appears to be the January 8, 2016 reexamination certificate is attached as Exhibit F to the SAC.  Vestas otherwise denies the allegations of paragraph 22 of the SAC.

23.     Vestas denies the allegations of paragraph 23 of the SAC.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 7,629,705

24.     Vestas restates and incorporates by reference the responses of the preceding paragraphs of this Answer as if fully set forth herein.

25.     Vestas admits that Vestas-American has sold V90-3.0, V100-2.0, V110-2.0, V112-3.0, and V117-3.3 wind turbines, and that it issued a news release on March 26, 2015 describing "a firm and unconditional order in the United States for 13 V112-3.075 MW turbines."  Vestas admits that wind turbines were installed at the wind farm described in the March 26, 2015 news release in 2016.  The remaining allegations of paragraph 25 of the SAC contain legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

26.     Vestas admits that the 2016 Annual Report of Vestas Wind Systems states that: "Depending on the customer risk profile, Vestas can provide everything from simply supplying the individual wind turbines to an all-inclusive package, including supply, installation, and calibration of the wind power plant as well as civil and electrical works."  Vestas admits that Vestas Wind Systems, in compliance

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 7 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

with its obligations as a listed Nasdaq Copenhagen company, issued Company Announcement No. 4/2015 on January 21, 2015 describing a firm and unconditional order for V100-2.0MW turbines in the United States; Company Announcement No. 73/2015 on December 24, 2015, describing a firm and unconditional order for V117-3.3MW turbines in the United States; and Company Announcement No. 12/2016 on March 31, 2016, describing a firm and unconditional order for V110-2.0MW turbines in the United States.  Vestas admits that Vestas Wind Systems Company Announcement Nos. 4/2015, 73/2015, and 12/2016 provide "[c]ontact details" for Hans Martin Smith, SVP of Group Treasury and Investor Relations at Vestas Wind Systems; Chris Brown, President of Vestas-American; and Michael Zarin, Head of External Communications at Vestas Wind Systems.  The remaining allegations of paragraph 26 of the SAC contain legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

27.     Vestas denies the allegations of paragraph 27 of the SAC.

28.     Vestas admits that one or more V90-3.0, V100-2.0, V110-2.0, V112-3.0, and/or V117-3.3 turbines were installed at the following wind farms after December 8, 2009: Spinning Spur III (Texas), Kingfisher, Headwaters (Indiana), South Plains (Texas), Hoopeston (Illinois), Alta II-IX (California), Brookfield (California), Granite Reliable (New Hampshire), Kibby Mountain (Maine), Solano III (California), and Kingdom Community (Vermont).  Vestas otherwise denies the allegations of paragraph 28 of the SAC.

29.     The allegations of paragraph 29 of the SAC contain legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 29 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the figure which the SAC claims is an "[e]xcerpt from Vestas brochure for 3.0MW onshore turbines."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

- 8 -

30.     The allegations of paragraph 30 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 30 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the figures which the SAC claims are "[e]xcerpts from Vestas brochures for V90 and V112 turbines."

31.     The allegations of paragraph 31 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 31 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "Vestas V100 Brochure" that the SAC purports to quote. Vestas also lacks sufficient knowledge or information to form a belief regarding the authenticity of the figures which the SAC claims are an "[e]xcerpt from Vestas Specification for V117 turbine" and an "[e]xcerpt from Vestas Presentation for V112 turbine."

32.     The allegations of paragraph 32 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 32 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the figure which the SAC claims is an "[e]xcerpt from Vestas Specification for V117 turbine."

33.     The allegations of paragraph 33 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 33 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the figure which the SAC claims is an "[e]xcerpt from Vestas Specification for V117 turbine."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 9 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

34. The allegations of paragraph 34 of the SAC assert legal conclusions to which no response is required. To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 34 of the SAC. Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "Vestas V100 Brochure" that the SAC purports to quote. Vestas also lacks sufficient knowledge or information to form a belief regarding the authenticity of the figures which the SAC claims are an "[e]xcerpt from Vestas Specification for V117 turbine" and an "[e]xcerpt from Vestas Presentation for V112 turbine."

35. The allegations of paragraph 35 of the SAC assert legal conclusions to which no response is required. To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 35 of the SAC.

36. On information and belief, Vestas admits that GE asserted infringement of claim 1 of the '705 patent against two Mitsubishi entities in the *MHI* litigation. Vestas admits that that Vestas-American and Steven Saylors were served with subpoenas to provide documents and testimony in the *MHI* litigation on or about September 14, 2011. Vestas admits that the subpoena's second Request for Production requested "documents and things" related to "[m]ethods and apparatuses of Vestas for configuring and operating electrical machines that remain connected to the electrical power system during low voltage or zero voltage events, prior to October 20, 2006." The remaining allegations of paragraph 36 of the SAC assert legal conclusions to which no response is required. To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

37. The allegations of paragraph 37 of the SAC assert legal conclusions to which no response is required. To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 37 of the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 10 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

SAC and restates and incorporates the responses of paragraphs 25 to 34 of this Answer as if fully set forth herein.

38.     The allegations of paragraph 38 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 38 of the SAC and restates and incorporates the responses of paragraph 36 of this Answer as if fully set forth herein.

39.     The allegations of paragraph 39 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 39 of the SAC.

40.     The allegations of paragraph 40 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 40 of the SAC.

41.     The allegations of paragraph 41 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 41 of the SAC.

42.     The allegations of paragraph 42 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 42 of the SAC.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 6,921,985

43.     Vestas restates and incorporates by reference the responses of the preceding paragraphs of this Answer as if fully set forth herein.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 11 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

44.     Vestas admits that Vestas-American has sold V90-3.0, V100-2.0, V110-2.2, V112-3.0, and V117-3.3 wind turbines, and incorporates the responses of paragraph 25 of this Answer as if fully set forth herein.  The remaining allegations of paragraph 44 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

45.     Vestas incorporates the responses of paragraph 26 of this Answer as if fully set forth herein.  The remaining allegations of paragraph 45 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

46.     Vestas denies the allegations of paragraph 46 of the SAC.

47.     The allegations of paragraph 47 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas admits that Vestas-American has sold wind turbines but denies the remaining allegations of paragraph 47 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "General Specification 2.0/2.2MW V100/110 50/60Hz" and "General Specification V117-3.3 MW 50/60 Hz" documents that the SAC purports to quote.

48.     The allegations of paragraph 48 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 48 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "General Specification 2.0/2.2MW V100/110 50/60Hz" that the SAC purports to quote.  Vestas also lacks sufficient knowledge or information to form a belief regarding the authenticity of the figure which the SAC claims is from the "General Specification V117-3.3 MW 50/60 Hz."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 12 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

49.     The allegations of paragraph 49 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 49 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "General Specification V90-3.0" and "General Specification V117-3.3 MW 50/60 Hz" documents that the SAC purports to quote.

50.     The allegations of paragraph 50 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 50 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "General Specification V90-3.0" and "General Specification V117-3.3 MW 50/60 Hz" documents that the SAC purports to quote.  Vestas also lacks sufficient knowledge or information to form a belief regarding the authenticity of the figures which the SAC claims are from the "General Specification V117-3.3 MW 50/60 Hz" and "General Specification 2.0/2.2MW V100/110 50/60Hz."

51.     The allegations of paragraph 51 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 51 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the "General Specification V90-3.0" and "General Specification 2.0/2.2MW V100/V110 50/60 Hz" documents that the SAC purports to quote.  Vestas also lacks sufficient knowledge or information to form a belief regarding the authenticity of the figure which the SAC claims is from the "General Specification V117-3.3 MW 50/60 Hz."

52.     The allegations of paragraph 52 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 52 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 13 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

the authenticity of the figures which the SAC claims are from the "General Specification V117-3.3 MW 50/60 Hz," "General Specification 2.0/2.2MW V100/110 50/60Hz," and "General Specification V90-3.0 MW."

53.     The allegations of paragraph 53 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 53 of the SAC.  Vestas lacks sufficient knowledge or information to form a belief regarding the authenticity of the figures which the SAC claims are from the "General Specification V90-3.0MW" and "General Specification V117-3.3 MW 50/60 Hz."

54.     Vestas admits that claim 6 of the '985 patent adds, in part, that "a low voltage event comprises a voltage at the output terminals of the generator between 15% and 50% of rated voltage of the generator."  Vestas restates and incorporates the responses of paragraphs 52 and 53 of this Answer as if fully set forth herein.  The remaining allegations of paragraph 54 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

55.     Vestas admits that claims 3 and 7 of the '985 patent both claim that "the low voltage event occurs for up to 3 seconds."  Vestas restates and incorporates the responses of paragraphs 52 to 54 of this Answer as if fully set forth herein.  The remaining allegations of paragraph 55 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

56.     The allegations of paragraph 56 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 56 of the SAC.

57.     On information and belief, Vestas admits that U.S. Patent Application No. 12/404,939 appears to have been filed on March 16, 2009, and that the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 14 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

application states, "U.S. Pat. No. 6,921,985 discloses a LVRT system for a wind turbine connected to a utility grid."  Vestas admits on information and belief that the '985 patent appears to have been cited in U.S. Patent Application No. 12/404,974 (filed on March 16, 2009) ("U.S. Pat. No. 6,921,985 discloses a LVRT system for a wind turbine connected to a utility grid."); WO 2011/095169 (filed on August 10, 2010) ("US 6,921,985 discloses the use of a shunt circuit or a crowbar circuit to shunt the sudden surge of current during a grid fault, such as a voltage dip."); and WO 2011/095169 (filed on February 2, 2011) (same).  The remaining allegations of paragraph 57 of the SAC assert legal conclusions to which no response is required. To the extent a response is determined to be required as to any remaining factual allegations, Vestas denies them.

58.     The allegations of paragraph 58 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 58 of the SAC, and restates and incorporates the responses of paragraphs 44 through 55 of this Answer as if fully set forth herein.

59.     The allegations of paragraph 59 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 59 of the SAC.

60.     The allegations of paragraph 60 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 60 of the SAC.

61.     The allegations of paragraph 61 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 61 of the SAC.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 15 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

62.     The allegations of paragraph 62 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 62 of the SAC.

63.     The allegations of paragraph 63 of the SAC assert legal conclusions to which no response is required.  To the extent a response is determined to be required as to any factual allegations, Vestas denies the allegations of paragraph 63 of the SAC.

## AFFIRMATIVE DEFENSES

As separate affirmative defenses to the SAC, Vestas alleges as follows:

### FIRST AFFIRMATIVE DEFENSE

#### (Non-Infringement)

64.     Vestas has not directly or indirectly infringed, literally or under the doctrine of equivalents, any valid or enforceable claim of the '985 or '705 patent.

### SECOND AFFIRMATIVE DEFENSE

#### (Invalidity)

65.     The claims of the '985 and '705 patents are invalid for failure to comply with one or more conditions for patentability, including those set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

### THIRD AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

66.     GE's claims are barred because GE has failed to state a claim upon which relief can be granted.

### FOURTH AFFIRMATIVE DEFENSE

#### (Estoppel, License, and Unclean Hands)

67.     GE's claims are barred by the doctrines of unclean hands, equitable estoppel, express or implied license, patent exhaustion, and/or release.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 16 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

68.     For example, GE had its employees participate in meetings and working groups to discuss and develop grid codes that include low (including zero) voltage ride through requirements.  Through these and other activities, GE exhibited conduct that implied its consent to allow others to use the asserted patents.  GE also actively encouraged the adoption of low (including zero) voltage ride through requirements in the United States and abroad.  GE did not disclose during those proceedings its alleged patent rights asserted in its SAC.

69.     Vestas employees also participated in meetings and working groups and relied on GE's conduct through those and other activities.  Allowing GE to proceed with its claim would therefore materially prejudice Vestas.

70.     As another example, on information and belief, GE encouraged organizations and regulatory bodies to adopt requirements relating to low (including zero) voltage ride through while also seeking a patent GE claims covers aspects of those requirements, with the intent to benefit unfairly in the marketplace.

71.     Similarly, on information and belief, GE encouraged organizations and regulatory bodies to adopt requirements relating to low (including zero) voltage ride through without disclosing to those organizations or their participants its existing, pending, or intended intellectual property rights relating to those requirements, with the intent to benefit unfairly in the marketplace.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver, Acquiescence, and/or Consent)

72.     GE's claims are barred in whole or in part by the doctrines of waiver, acquiescence, and/or consent.

## SIXTH AFFIRMATIVE DEFENSE

### (Failure to Mark)

73.     On information and belief, GE and/or its licensee(s) failed to comply with the marking requirements of 35 U.S.C. § 287.  GE therefore cannot recover damages for any period prior to the filing of this lawsuit.

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 17 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1

## SEVENTH AFFIRMATIVE DEFENSE

2

### (Intervening Rights)

3       74.     GE's claims for relief are limited due to absolute and/or equitable

4   intervening rights under 35 U.S.C. §§ 252 and 307(b).

5

## EIGHTH AFFIRMATIVE DEFENSE

6

### (Collateral Estoppel)

7       75.     GE is estopped from relitigating any issues already litigated in the *MHI*

8   litigation, or any other litigation involving the '705 and '985 patents.

9

## NINTH AFFIRMATIVE DEFENSE

10

### (Prosecution History Estoppel)

11       76.     GE's claims are barred in whole or in part by the doctrine of

12   prosecution history estoppel.

13

## TENTH AFFIRMATIVE DEFENSE

14

### (Limits on Damages)

15       77.     GE's claims are barred in whole or in part by 35 U.S.C. § 286 and 28

16   U.S.C. § 1498.

17

## ELEVENTH AFFIRMATIVE DEFENSE

18

### (Laches and Undue Delay)

19       78.     GE is barred from any equitable relief due to its undue delay in

20   asserting the '705 and '985 patents.  GE has been aware of Vestas's wind turbines

21   since at least October 2003, as set forth in further detail below in paragraph 148.

22   The '705 patent issued on December 8, 2009, and the '985 patent issued on July 26,

23   2005.  GE thus delayed nearly eight years in filing the instant suit with respect to the

24   '705 patent, and *twelve* years with respect to the '985 patent.  GE's unreasonable and

25   inexcusable delay has resulted in material prejudice to Vestas.

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

## TWELFTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct: Unenforceability of the '705 Patent)

79.    The '705 patent is unenforceable under the doctrine of inequitable conduct.

80.    As set forth below, at least five GE employees (including a patent attorney and inventor) with a duty to disclose material prior art to the Patent and Trademark Office ("PTO") instead concealed their knowledge of more than six separate pieces of prior art, including GE's own testing and public operation of potentially patent-practicing wind turbines, its competitors'—including Vestas Wind Systems's—even earlier testing and public use of anticipatory wind turbines, and numerous patent applications and presentations describing those uses, all of which are material to the allegedly inventive aspect of GE's '705 patent.  Indeed, when this issue was considered by another district court during the second phase of the *MHI* litigation, that court concluded (after a six-day inequitable conduct bench trial) that GE's employees withheld so much material prior art from the PTO that their conduct amounted to concealing the "***entire*** state of the wind industry."  *Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd.*, 946 F. Supp. 2d 582, 591 (N.D. Tex. 2013) (emphasis added).[1]  As explained further below, if that prior art had been disclosed, the claims of the '705 patent would not have issued.  The fact that GE's patent counsel, purported inventor, and engineers withheld ***all*** of that material prior art, of which they had full knowledge, establishes (along with other facts discussed below) that all five GE employees had an intent to deceive the PTO, and succeeded in their corrupt endeavor.  Because the '705 patent was obtained based on this inequitable conduct, it is not enforceable.

81.    GE filed the application that would become the '705 patent on October 20, 2006.  By GE's own admission, the '705 patent is directed to what GE describes

---

[1] All subsequent references to the *MHI* decision are in reference to this opinion.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

- 19 -

(using its coined phrase) as "zero voltage ride through" technology ("ZVRT").[2]  *See* SAC ¶ 2.  The essential idea the '705 patent wrongly attempts to protect is keeping a wind turbine connected to a power utility grid even when some "fault" on that grid, such as a lightning strike, causes the voltage on the grid to drop to zero. Historically, certain wind turbines would disconnect from the grid whenever the grid voltage dropped below some threshold.  But by 2000, grid codes (*i.e.*, rules governing devices connected to the electrical grid) were being developed that required wind turbines to stay connected to the grid through faults at least as low as 15% of "normal" voltage, sometimes called "low voltage ride through."  And shortly thereafter, at least some grid codes *required* wind turbines to stay connected to the grid even during faults going down to *zero volts*, which continued to be called "low voltage ride through."

82.   GE relied on this false distinction between low voltage and zero voltage ride through, the sole basis on which GE's patent claims were granted, to mislead the PTO about the state of the art.  For example, as the *MHI* court explained, "[t]hree to four years before [GE] filed their 705 patent application, wind turbine manufacturers around the world had developed the capacity to ride through zero voltage faults."  *MHI*, 946 F. Supp. 2d at 595.  But "GE's competitors did not use the shorthand 'ZVRT' to describe their capabilities – that phrase was created by GE as a marketing tool."  *Id.*  Even in February 2005 GE continued to describe its zero voltage ride through technology as "LVRT-3."  Yet in the '705 patent specification, "ZVRT is contrasted to low voltage ride through (LVRT) features," which the patent admits were "known in the art."  '705 patent at 6:63-67.  GE's sudden adoption of the term "ZVRT" "made it more difficult for the PTO examiner to do computer word searches for prior art."  *MHI*, 946 F. Supp. 2d at 595.  Thus, it was only the

---

[2] Throughout this section, the term "ZVRT" is used for convenience only, to remain consistent with the language used by the *MHI* court.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 20 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  "novelty of the *term* 'ZVRT,'" and not the novelty of "the technology," that led to

2  GE's success in deceiving the PTO.  *Id.* (emphasis added).

3      83.    Based on GE's deception, the PTO ultimately allowed the '705 patent

4  claims to issue after GE amended its claims to specify "zero volts," instead of

5  generally including all low voltage ride through.  *MHI*, 946 F. Supp. 2d at 594 ("The

6  initial '705 application filed in 2006 actually sought to patent all methods and

7  apparatus for ***low voltage ride through***, something GE now concedes was very

8  widely anticipated by prior art in 2006.").  But this amendment was not enough to

9  avoid the large swaths of prior art still unknown to the patent examiner.  Instead, the

10  *MHI* court determined that methods for achieving even zero voltage ride through,

11  *e.g.*, by "configuring the electrical machine and the control system such that the

12  electrical machine remains electrically connected to the electric power system

13  during and subsequent to the voltage amplitude of the electric power system

14  decreasing below the predetermined range including approximately zero volts for

15  the undetermined period of time," '705 patent at cl. 1, were known in the wind

16  industry at least as early as 2002, and in fact became industry standard by 2003,

17  years before GE filed the relevant patent application.

18      84.    The *MHI* court also determined that five individuals at GE—James

19  McGinness, Nicholas Miller, Einar Larsen, Scott Frame, and Robert Delmerico—

20  each knew of one or more prior art publications or uses relating to zero voltage ride

21  through yet failed (despite their duty of candor) to disclose any of those prior art

22  publications or uses to the PTO during the '705 patent's initial prosecution.  As

23  discussed in further detail below, at least these five individuals withheld prior art

24  and uses with the specific intent to deceive the PTO in order to obtain issuance of

25  the claims of the '705 patent.  The PTO would not have allowed the '705 claims if

26  GE had disclosed this material prior art.

27      85.    As detailed further below, the '705 patent survived a finding of

28  unenforceability in the *MHI* litigation because GE successfully asserted privilege to

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

- 21 -

avoid production of any "smoking gun" document, which the *MHI* court believed was required to find intent to deceive under the then-recent *Therasense* decision. *MHI*, 946 F. Supp. 2d at 589. But the Federal Circuit has since clarified that no such silver bullet is necessary to prove intent to deceive. *See, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 768 F.3d 1185, 1191 (Fed. Cir. 2014) (affirming finding of inequitable conduct based on the patent prosecutor's "lack of credibility," rather than the existence of any smoking gun document). Accordingly, under the current legal standard, the '705 patent is unenforceable as a result of GE's inequitable conduct. Details of this inequitable conduct are set forth in the following paragraphs.

## **THE OMITTED PRIOR ART IS MATERIAL TO THE '705 PATENT**

### *GE Concealed the "Entire State of the Wind Industry" from the PTO*

86.  The '705 patent is directed to methods for achieving LVRT, including riding through zero voltage faults. Indeed, "[u]nder GE's theory, the 705 patent application sought to patent ZVRT for *any* duration and for *all* techniques for achieving ZVRT through the controls within the turbine." *MHI*, 946 F. Supp. 2d at 594 (emphasis added).

87.  Any omitted prior art reference which discloses a solution for riding through zero voltage faults is but-for material to the '705 patent, because the PTO would not have allowed the '705 patent to issue if it had been made aware of ZVRT prior art. The '705 application was allowed only because of its supposedly novel ZVRT limitation. Initially, the '705 application contained "broad" independent *LVRT* claims, and the ZVRT limitations were present only in dependent claims. *MHI*, 946 F. Supp. 2d at 594. The PTO examiner rejected the independent LVRT claims as unpatentable over another GE patent application that GE had failed to disclose. *Id.* The examiner, however, "had no ZVRT prior art before him" due to GE's deception. *Id.* at 598. He thus indicated to GE that the dependent ZVRT claims "would be allowable if rewritten in independent form." *Id.* The examiner

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1   allowed the claim after GE added a ZVRT limitation to the rejected independent
2   LVRT claim.  The ZVRT limitation is thus the *only* source of alleged novelty in
3   claim 1 of the '705 patent.

4   88.   GE's ZVRT solution, however, was *not* novel, because GE was not the
5   first company to develop a technical solution for ZVRT.  Instead, "GE's European
6   competitors [including specifically Vestas Wind Systems] were the first
7   manufacturers to develop technical solutions capable of riding through zero-voltage
8   events, and to seek patents on the new technology."  *MHI*, 946 F. Supp. 2d at 595-
9   96.  GE did not disclose this fact to the PTO.  Instead, "[b]y omitting ***the entire state***
10  of the U.S. wind industry, GE led the Patent Office to believe that its invention was
11  the first to successfully ride through zero voltage events."  *Id.* at 591.

### *2002-2003: Vestas Achieves and Publicizes ZVRT*

13  89.   "First came Vestas [Wind Systems]," which "developed several
14  different techniques [for ZVRT] in 2002 and 2003."  *MHI*, 946 F. Supp. 2d at 595-
15  96.  Vestas Wind Systems took immediate steps to publicize these developments.

16  90.   ***Bolik Paper (June 2003).***   In June 2003, Sigrid Bolik, an electrical
17  engineer at Vestas Wind Systems, presented at the European Wind Energy
18  Convention in Madrid, Spain, with a paper titled "Vestas Handles Grid
19  Requirements: Advanced Control Strategy for Wind Turbines."  Bolik wrote that,
20  using the Vestas Converter System, "[t]he turbine will always be connected to the
21  grid, even at 0 voltage for 200ms."

22  91.   ***Bolik Paper and Presentation (October 2003) and Saylors.***  On
23  October 20 and 21, 2003, two engineers concurrently presented in Denmark and in
24  Boston on Vestas's work.   Bolik presented a second paper, titled "Grid
25  Requirements Challenges for Wind Turbines," at the Fourth International Workshop
26  on Large-Scale Integration of Wind Power and Transmission Networks for Offshore
27  Wind Farms in Denmark, with accompanying demonstrative slides ("Bolik
28  Presentation").  Steven Saylors, a chief electrical engineer at Vestas-American, also

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 23 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

presented on low (including zero) voltage fault ride through capabilities at a meeting of the New England Power Pool in Boston, Massachusetts, in a presentation titled "Low Voltage Ride Through Capabilities of Vestas Wind Turbine Generators for the North American Market" ("Saylors Presentation").

92.     The Bolik Papers of June and October 2003, as well as the Bolik Presentation of October 2003, are but-for material to the '705 patent because they each describe growing trends in wind turbine grid requirements pre-dating the '705 patent, as well as "configuring the electrical machine and the control system such that the electrical machine remains electrically connected to the electric power system during and subsequent to the voltage amplitude of the electric power system decreasing below the predetermined range including approximately zero volts for the undetermined period of time, thereby facilitating zero voltage ride through (ZVRT)." '705 patent at cl. 1 (the "ZVRT limitation").

93.     The Bolik Papers and Presentation disclose the ZVRT limitation because they describe riding through zero voltage faults and the control systems that enable it, which, like the claims of the '705 patent, include "always be[ing] connected to the grid, even at 0 voltage." Bolik (June 2003) at 4; Bolik (October 2003) at 4; Bolik Presentation at 9. These include "a Vestas developed control strategy" called the "back-to-back Vestas Converter System." Bolik (June 2003) at Abstract; Bolik (October 2003) at Abstract. In addition, the Bolik Presentation illustrates tolerance at zero volts, as depicted below.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1
2
3
4
5
6
7
8
9



Bolik Presentation at 11.

10

94.     In addition to disclosing the ZVRT limitation as described above, the Bolik Papers and Presentation, coupled with the knowledge of a person having ordinary skill in the art, disclose "coupling the electrical machine to an electric power system such that the electric power system is configured to transmit at least one phase of electric power to the electrical machine." *See, e.g.*, Bolik (June 2003) at 3-4 & fig. 5; Bolik (Oct. 2003) at Abstract.  The Bolik Papers and Presentation also each disclose "configuring the electrical machine such that the electrical machine remains electrically connected to the electric power system during and subsequent to a voltage amplitude of the electric power system operating outside of a predetermined range for an undetermined period of time." *See, e.g.*, Bolik (June 2003) at 3-4 & fig. 5; Bolik (Oct. 2003) at 4:17-19 & fig. 5; Bolik Presentation at 9-11.  The Bolik Papers and Presentation further disclose "electrically coupling at least a portion of a control system to at least a portion of the electric power system" and "coupling the control system in electronic data communication with at least a portion of the electrical machine." *See, e.g.*, Bolik (June 2003) at 3-4; Bolik (Oct. 2003) at abstract, 4; Bolik Presentation at 5.

95.     Thus, because the Bolik Papers and Presentation disclose every limitation of claim 1, including the ZVRT limitation, they are material to the '705

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 25 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  patent.  The MHI court reached the same conclusion of materiality.  *MHI*, 946 F.

2  Supp. 2d at 604-05.

3       96.    The Saylors Presentation is also but-for material to the '705 patent

4  because it describes various Vestas wind turbine models capable of riding through

5  low (including zero) voltage faults, including a model V90-3.0MW VCRS having

6  "[i]mproved LVRT capabilities through Advanced Grid Options (AGO 2 and 3)."

7  Saylors Presentation at 10.    AGO 3, in turn, is described as allowing for

8  "withstand[ing] voltage drop to 0% for 10 s."  *Id.* at 13.

9       97.    In addition to disclosing the ZVRT limitation as set forth above, the

10 Saylors Presentation, coupled with the knowledge of a person having ordinary skill

11 in the art, discloses "coupling the electrical machine to an electric power system

12 such that the electric power system is configured to transmit at least one phase of

13 electric power to the electrical machine."  *See, e.g.*, Saylors Presentation at 10.  The

14 Saylors Presentation also discloses "configuring the electrical machine such that the

15 electrical machine remains electrically connected to the electric power system

16 during and subsequent to a voltage amplitude of the electric power system operating

17 outside of a predetermined range for an undetermined period of time."  *See, e.g.*, *id.*

18 at 11.  The Saylors Presentation further discloses "electrically coupling at least a

19 portion of a control system to at least a portion of the electric power system" and

20 "coupling the control system in electronic data communication with at least a

21 portion of the electrical machine."  *See, e.g.*, *id.* at 10.

22      98.    The Saylors Presentation is thus but-for material to the '705 patent.

23 The *MHI* court reached the same conclusion.  *MHI*, 946 F. Supp. 2d at 604-05.

24      99.    ***Nielsen '936.***    Vestas Wind Systems also filed WO 2004/070936

25 ("Nielsen '936") on February 7, 2003.  Nielsen '936 is but-for material to the '705

26 patent because it describes a controller for a power system of a wind-turbine

27 generator allowing it to remain connected to an electric grid during faults, including

28 faults going down to zero volts.  Nielsen '936 at Abstract.  Because Nielsen '936 was

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 26 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1   published on August 19, 2004, it is § 102(b) prior art to the '705 patent.  Nielsen

2   '936's system discloses the ZVRT limitation of claim 1 because it allows the turbine

3   generator to remain connected to the grid during "fault conditions, such as low

4   voltages or zero voltages on the power grid," by providing a means to dissipate

5   excess power.  *Id.* at 2:7-8 (emphasis added).  Nielsen '936 thus allows the "wind

6   turbine generator [to remain] at least partly magnetized during grid faults and thus

7   ready for delivering power to the power grid, as soon as the grid voltage is re-

8   established after the fault."  *Id.* at Abstract.

9        100.  In addition to the ZVRT limitation, Nielsen '936, coupled with the

10  knowledge of a person having ordinary skill in the art, discloses every other

11  limitation of claim 1 of the '705 patent.  It discloses "coupling the electrical machine

12  to an electric power system such that the electric power system is configured to

13  transmit at least one phase of electric power to the electrical machine."  *See, e.g.*,

14  Nielsen '936 at 2:25-28.  Nielsen '936 also discloses "configuring the electrical

15  machine such that the electrical machine remains electrically connected to the

16  electric power system during and subsequent to a voltage amplitude of the electric

17  power system operating outside of a predetermined range for an undetermined

18  period of time."  *See, e.g.*, *id.* at 2:7-8; *id.* at 2:15-35 & figs. 1-2; *id.* at 4:26-29; *id.* at

19  5:5-9; *id.* at 6:11-12.  Nielsen '936 further discloses "electrically coupling at least a

20  portion of a control system to at least a portion of the electric power system" and

21  "coupling the control system in electronic data communication with at least a

22  portion of the electrical machine."  *See, e.g.*, *id.* at 2:30-33 & figs. 1-2; *id.* at 5:5-9;

23  *id.* at 6:11-12 & fig. 3.

24       101.  Nielsen '936 thus discloses all the limitations of claim 1 of the '705

25  patent.  And because Nielsen '936 discloses the ability to ride through "zero voltages

26  on the power grid," *id.*, and ZVRT is the sole basis on which claim 1 of the '705

27  patent was allowed by the Patent Office, Nielsen '936 is but-for material.  The *MHI*

28  court reached the same conclusion on materiality.  *MHI*, 946 F. Supp. 2d at 604.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 27 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

### *2003:  Enercon Achieves and Publicizes ZVRT*

102.  By 2003, Enercon, a German wind turbine manufacturer, had developed wind turbines that were capable of ZVRT.  Also like Vestas, Enercon immediately publicized its ZVRT accomplishments.

103.  ***Wobben '941 and Hartge.***  Enercon filed WO 2005/031941 ("Wobben '941") on September 22, 2004, with a priority date of September 23, 2003.  Wobben '941 describes a solution for riding through a "3-phase fault F with zero impedance," *i.e.*, a complete short-circuit or zero-voltage event, with a "duration of 770 ms." *MHI*, 946 F. Supp. 2d at 610; Wobben '941 at 9:16-17.  On October 21, 2003, Stefan Hartge, an Enercon engineer, presented the technology and invention of Wobben '941 in a paper titled "Ride-Through Capability of ENERCON-Wind Turbines" ("Hartge") at the Fourth International Workshop in Denmark, on the same panel as Vestas engineer Bolik.  During the *MHI* inequitable conduct trial, GE's expert testified that Hartge's presentation was "essentially the same thing" as Wobben '941, as Hartge simply "[took] the patent and converted it into a conference paper." Transcript of Trial 6A at 95:14-19, *MHI*, 946 F. Supp. 2d 582 (No. 3:10-cv-276) (N.D. Tex. 2013) [hereinafter *MHI* Trial Tr.].

104.  Wobben '941 and Hartge are but-for material to the '705 patent because they describe the operation of a control apparatus for a power system of a wind turbine connected to the power grid, the control apparatus designed to allow the turbine to maintain operation during fault conditions.  Wobben '941 at 2:3-23. Wobben '941 was published on April 7, 2005, and is thus § 102(b) prior art to the '705 patent.  Wobben '941 discloses the ZVRT limitation because it describes riding through voltage faults, including a "symmetrical 3-phase fault with zero impedance," as illustrated in Figure 5.  *Id.* at 9:14-17 & fig. 5.  Wobben '941 also provides multiple testing results showing the system's performance during the disclosed "fault voltage collapse." *See, e.g.*, *id.* at 9:24-27 & fig. 6; *id.* at figs. 8-13.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 28 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)



Fig. 5

Figure 5 of Wobben '941.

105.   In addition to the ZVRT limitation, Wobben '941 discloses every other limitation of claim 1 of the '705 patent.  It discloses "coupling the electrical machine to an electric power system such that the electric power system is configured to transmit at least one phase of electric power to the electrical machine."  *See, e.g.*, Wobben '941 at 2:3-7; *id.* at 2:15-23.  Wobben '941 also discloses "configuring the electrical machine such that the electrical machine remains electrically connected to the electric power system during and subsequent to a voltage amplitude of the electric power system operating outside of a predetermined range for an undetermined period of time."  *See, e.g.*, *id.* at 7:5-6; *id.* at 9:14-17 & fig. 5; *id.* at 9:24-27 & fig. 6; *id.* at fig. 8; *id.* at fig. 9; *id.* at 13:4-6.  Wobben '941 further discloses "electrically coupling at least a portion of a control system to at least a portion of the electric power system" and "coupling the control system in electronic data communication with at least a portion of the electrical machine."  *See, e.g.*, *id.* at 8:22-26; *id.* at 11:4-10; *id.* at 13:4-6.

106.   Wobben '941 is therefore but-for material to the '705 patent, a conclusion the *MHI* court also reached.  *MHI*, 946 F. Supp. 2d at 602-03.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

*2003-2004: GE Achieves ZVRT and Sells ZVRT-Capable Turbines*

107.  GE itself had installed and commissioned ZVRT-capable wind turbines by the end of 2003.  It conducted successful field tests of its ZVRT capability on June 20, 2003, more than three years before it filed the '705 application, at a site in Salem, Virginia.  *MHI*, 946 F. Supp. 2d at 596.  GE's pre-production testing of these converters demonstrated that they had ZVRT capability of at least 100 milliseconds, and could remain connected to the grid during zero-voltage faults.  Internal GE reports described the GEIS converter as "operating flawlessly during and after the faults," *id.*, including faults "with a complete short circuit, down to zero volts at the transformer primary." *Id*. at 605.  GE conducted at least one other test in July 25, 2003 at a site in Tehachapi, California, which was also successful.  These turbines were in public use and/or on-sale more than a year prior to the filing of the application leading to the '705 patent and are thus invalidating prior art.

108.  *GE's Sale of ZVRT-Capable GEIS Converters.*  After the successful Tehachapi test, GE Wind, at the direction of Scott Frame, immediately began commercial production of the ZVRT-capable GEIS converters.  GE then sold, installed, and commissioned these converters to at least three United States wind farms: Colorado Green in Colorado; Sweetwater I in Nolan County, Texas; and Cowboy Wind in Weatherford, Oklahoma.  Colorado Green first sold power on, and thus was fully operational by, November 18, 2003.  Sweetwater I completed development and went into service in December 2003.  Cowboy Wind first sold power on April 30, 2005.  The GEIS converters tested at Tehachapi were the same as the ones sold to Colorado Green and Sweetwater I.  *MHI*, 946 F. Supp. 2d at 606.

109.  Colorado Green, Cowboy Wind, and Sweetwater I constitute prior public uses and/or sales of the claimed invention of the '705 patent which would invalidate at least claim 1, alone or in combination with the other prior art.  On information and belief, for each of these wind farms, more than one year before the '705 patent was filed, GE installed and commissioned turbines that practice at least

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 30 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

claim 1 of the '705 patent, and the farm operator produced and delivered electricity to the grid using those turbines.  These constitute prior art under at least 35 U.S.C. §§ 102(a) & (b) (pre-AIA).  The prior public uses at Cowboy Wind, Colorado Green, and Sweetwater I are therefore but-for material to the '705 patent.  The MHI district court reached the same conclusion.  *MHI*, 946 F. Supp. 2d at 608-09.

### *2004: ZVRT Becomes Widely-Known and Practiced*

110.  By 2004, methods for achieving ZVRT were widely-known and practiced by the majority of the wind turbine industry.

111.  In October 2004, the Western Electricity Coordinating Council ("WECC"), the entity empowered by the Federal Energy Regulation Commission ("FERC") to monitor and enforce compliance with grid code standards in the western United States and Canada, proposed new ZVRT requirements for the WECC region.  These requirements would have mandated ZVRT capability of "roughly 50 to 133ms." *MHI*, 946 F. Supp. 2d at 597.

112.  ***Erdman '083.***  On November 3, 2004, Clipper WindPower, one of GE's American competitors, filed U.S. Patent Pub. No. 2005/0122083 ("Erdman '083"), titled "Generator with Utility Fault Ride-Through Technology."  Erdman '083 describes "[a] wind powered turbine with low voltage ride-through capability," and "addresses faults down to zero" "on its face." *MHI*, 946 F. Supp. 2d at 599-600.  Erdman '083 was published on June 9, 2005, qualifying it as prior art.

113.  Erdman '083 is but-for material to the '705 patent because, like claim 1 of the '705 patent, Erdman '083 discloses a control system for a wind turbine power system to allow it to "ride-through" faults, including voltage irregularities on the grid, and thereby remain connected to the grid. *See*, *e.g.*, Erdman '083 at Abstract, [0031]-[0033].  Tracking a voltage on the low-voltage side of an inverter control circuit, Erdman '083's system is designed to respond when sensed voltage is outside of a predetermined range, which is also claimed in the '705 patent. *See id.* at [0035].  Erdman '083 also specifically describes handling voltage faults of various kinds,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 31 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  "even if voltage is zero at a fault point at a distant location on the utility collection,

2  distribution, sub-transmission, or transmission system." *Id.* at [0017], [0035].

3      114.   In addition to disclosing the ZVRT limitation as set forth above,

4  Erdman '083 discloses every other limitation of claim 1 of the '705 patent.   It

5  discloses "coupling the electrical machine to an electric power system such that the

6  electric power system is configured to transmit at least one phase of electric power

7  to the electrical machine." *See, e.g.*, Erdman '083 at [0030]-[0031] & fig. 1; *id.* at

8  [0033] & fig. 2.   Erdman '083 also discloses "configuring the electrical machine

9  such that the electrical machine remains electrically connected to the electric power

10  system during and subsequent to a voltage amplitude of the electric power system

11  operating outside of a predetermined range for an undetermined period of time."

12  *See, e.g.*, *id.* at [0030] & fig. 1; *id.* at [0035]; *id.* at [0047].   Erdman '083 further

13  discloses "electrically coupling at least a portion of a control system to at least a

14  portion of the electric power system" and "coupling the control system in electronic

15  data communication with at least a portion of the electrical machine." *See, e.g., id.*

16  at [0031].

17      115.   Further, because GE claimed that the '705 patent covers any "method

18  and apparatus of ride-through down to approximately zero volts," and Erdman '083

19  discloses "enabl[ing] the generator to remain connected even if voltage at the

20  transmission or collection system fault is zero," the MHI district court also

21  concluded that Erdman '083 is but-for material to the '705 patent.   *MHI*, 946 F.

22  Supp. 2d at 600-02.

23          ***2005: FERC Requires ZVRT on the United States Grid***

24      116.   "By October 2005—one year before the filing of the 705 patent

25  application—almost ***every manufacturer*** had LVRT capability and at least three GE

26  competitors had controls-based ZVRT capability." *MHI*, 946 F. Supp. 2d at 599

27  (emphasis added).   And after a six-day trial, the *MHI* court concluded that "[t]he

28  omitted references reveal that the technology for connecting wind turbines to the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 32 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1    electrical grid had significantly progressed from the Janssen '188 application [the
2    only prior art cited by GE during prosecution] and that ***numerous industry players***
3    had already invented ZVRT technology long before GE filed the '705 patent
4    application." *Id.* (emphasis added).

5         117.   On December 12, 2005, the Federal Energy Regulatory Commission
6    issued FERC Order 661A, which mandated that all major wind generating plants in
7    the United States must "remain interconnected during such a fault on the
8    transmission system for a voltage level as low as zero volts" for "9 cycles," or
9    roughly 150 milliseconds.  FERC Order 661A at 51-52.

10        118.   Eight days later, McGinness approved, and GE began work on, the '705
11   application.  *MHI*, 946 F. Supp. 2d at 597-98.

12        119.   Thus, the omitted material references and prior public uses include at
13   least the Bolik Papers and Presentation, the Saylors Presentation, Nielsen '936,
14   Wobben '941, Hartge, Erdman '083, Colorado Green, Sweetwater I, and Cowboy
15   Wind.  Vestas makes this preliminary identification of omitted, material prior art
16   based on public information currently available to it.  Vestas reserves the right to
17   identify additional omitted, material prior art, including as a result of information
18   obtained in discovery in this case.

19        ***GE's Attempt to Whitewash Some of This Art Through Reexam Fails***

20        120.   A patent office reexamination cannot remedy inequitable conduct.  *See,*
21   *e.g.*, *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed. Cir. 1995) ("We
22   recognize that [the withheld references] were cited eventually to the PTO and that
23   the examiner . . . passed the reexamination application to issue thereafter.  However,
24   the references were not cited when they should have been.") (affirming district
25   court's finding of inequitable conduct); *Bristol-Myers Squibb Co. v. Rhone-Poulenc*
26   *Rorer, Inc.*, 326 F.3d 1226, 1241 (Fed. Cir. 2003) ("[T]he issue is RPR's intent
27   during the prosecution of the original application.  Thus, RPR's disclosure during
28   reissue is irrelevant to the inquiry of whether RPR acquired the '011 patent by

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 33 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

engaging in inequitable conduct.").   Despite knowing full well that no reexam decision could cleanse the '705 patent of its deceptive beginnings, GE continued its trend of manipulation and deception by trying to use '705 patent reexaminations for precisely that improper purpose.   But those reexams, which are described in more detail below, have little relevance here for at least three reasons: (i) the PTO was prohibited from considering any prior uses or sales, such as GE's own testing and its installations at Cowboy Wind, Colorado Green, and Sweetwater, in reassessing the '705 patent's validity; (ii) the PTO never considered other material prior art, including the Bolik and Saylors references, which GE withheld from the reexams; and (iii) even with respect to prior art the PTO did consider, no final decision was reached in the more comprehensive *inter partes* reexam because MHI and GE settled their litigation and terminated the reexam before it had been completed.

121.   In Reexamination Control No. 95/000,633 ("the '633 reexam"), MHI filed a request for *inter partes* reexamination of claims 1-9, 13, and 14 of the '705 patent on May 24, 2011, citing Erdman '083; E.ON 2003 Standard; Wobben '941; U.S. Patent No. 6,784,565 ("Wall '565"); Nielsen '936; and WO 03/058789 ("Feddersen '789"), among others.   The PTO granted the reexamination request on July 27, 2011 and issued a Non-Final Action rejecting claims 1 and 7 of the '705 patent as anticipated by Erdman '083, anticipated by Wobben '941, anticipated by Wall '565, and unpatentable over Feddersen '789 in view of E.ON 2003 Standard. The PTO also rejected claim 7 of the '705 patent as anticipated by Nielsen '936.

122.   After responses from GE and MHI, the PTO issued a non-final Action Closing Prosecution on September 25, 2012, again rejecting claim 1 as anticipated by Erdman '083, Wobben '941, and Wall '565, and claim 7 as anticipated by Nielsen '936.   After filing a written response on November 26, 2012, GE then arranged an *ex parte* meeting with the examiner, Robert Nasser, on December 20, 2012.   In this meeting, McGinness, Larsen, and GE's *MHI* litigation counsel "delivered a 37-page PowerPoint presentation" to Examiner Nasser.   *MHI*, 946 F. Supp. 2d at 588.   The

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 34 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

PTO thereafter issued a **non-final** Right of Appeal Notice on May 7, 2013 in which it reversed its prior decision and concluded that claims 1 and 7 were allowable over Erdman '083 and Wobben '941, and that claim 7 was allowable over Nielsen '936. The PTO nonetheless rejected claims 1 and 7 as anticipated by Wall '565. ***The '633 reexam was dismissed in September 2014*** under 35 U.S.C. § 317(b) as to claims 1-6 pursuant to a settlement between GE and MHI, ***before any final decision was issued as to those claims***.

123.   In Reexamination Control No. 90/012,587 ("the '587 reexamination"), MHI filed a request for *ex parte* reexamination of claim 1 of the '705 patent on September 14, 2012, citing only Nielsen '936.  The PTO granted the reexam on October 26, 2012.  In a Non-Final Action on December 18, 2012, the PTO rejected claim 1 as anticipated by Nielsen '936.  Two days later, on December 20, 2012, GE then arranged an *ex parte* meeting with Examiner Nasser, as described in the preceding paragraph.  On June 21, 2013, the PTO issued a Notice of Intent to Issue A Reexam Certificate, finding claim 1 patentable over Nielsen '936.  The reexamination certificate that subsequently issued noted on its face that it was subject to any determinations made in the '633 reexamination, which was still ongoing at the time of issuance.

124.   Ultimately, these reexaminations do not negate GE's history of inequitable conduct.  First, much of the material prior art that GE's employees withheld from the PTO (as discussed in more detail in the preceding and following paragraphs) was by law beyond the scope of the reexaminations.  *See* 37 C.F.R. 1.906 (limiting the evaluation of a claim during an *inter partes* reexamination to "patents or printed publications"); 37 C.F.R. 1.552 (same for *ex parte* reexamination).  Public testing and uses of the alleged invention, such as GE's Tehachapi and Salem testing; and sales and offers for sale, including GE's Cowboy Wind, Colorado Green, and Sweetwater sales, all fall beyond that scope.  (Only the original patent examiner could have considered these activities, but he was denied

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 35 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

the opportunity to do so because of GE's inequitable conduct.)  Under 35 U.S.C. § 102(b) (pre-AIA), a patent shall not issue if the invention was "in public use or on sale in this country, more than one year prior to the date of application for patent in the United States."  Each of GE's tests and sales is independently invalidating under this statute, yet the PTO did not and could not consider these activities during the reexaminations.

125.   Second, GE withheld material prior art references that could have been considered by the PTO during the '633 and '587 reexams.  For example, neither the Bolik Papers and Presentation nor the Saylors Presentation were disclosed even at this late date, despite the fact that they were simultaneously being actively litigated in the *MHI* case.  Indeed, GE failed to disclose the Bolik and Saylors references *even after* the *MHI* court issued its findings of fact concluding that they were but-for material to claims 1 and 7 of the '705 patent.  The '633 reexam did not terminate as to claims 1-6 until September 2014, over a year after the *MHI* inequitable conduct ruling issued, and it did not terminate as to claim 7 until August 17, 2016, over three years after the ruling issued.  Thus, GE in fact *again* committed inequitable conduct, this time during the '633 reexam, by failing to provide the PTO with full copies of the Bolik and Saylors references after the *MHI* court concluded that they were but-for material to the '705 patent.  As a result, the reexams at most addressed only three of the at least six pieces of prior art GE withheld from the PTO during the original prosecution.  GE deprived the examiner of the ability to consider a number of highly material references (as well as the combination, for purposes of obviousness, of those withheld references with references that were of record in the reexams).

126.   Third, even for the few references that were considered, the '633 reexamination of claims 1-6 was never completed.  Instead, it was dismissed under 35 U.S.C. § 317(b) on September 19, 2014, pursuant to a settlement between GE and MHI, before any final decision was issued.  This Section 317(b) dismissal effectively cancelled any determinations previously made in the '633 reexamination

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 36 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

as to claims 1-6.  The reexamination certificate that subsequently issued for the '633 reexamination states that the patentability of claim 1 was not considered.  Thus, no final decision was ever reached on the patentability of claim 1 in this reexam because GE terminated the reexam as part of its settlement with MHI.

## GE'S EMPLOYEES WERE AWARE OF THE OMITTED PRIOR ART AND KNEW IT WAS MATERIAL

127.  As set forth in further detail below, at least five GE employees—including James McGinness, GE's Chief IP Counsel at the time of the prosecution of the '705 patent, who prepared and prosecuted the application; Einar Larsen, a GE engineer and named co-inventor on the '705 patent; and Nick Miller, Scott Frame, and Bob Delmerico, all GE employees who were substantively involved both in the prosecution of the '705 patent application and in monitoring and keeping apprised of the state of the global wind turbine industry—were aware of various pieces of omitted prior art, and knew them to be material to the '705 application.

128.  McGinness, Larsen, Miller, Frame, and Delmerico were all members of GE's ZVRT Program and Grid Interconnect IP teams.

129.  The ZVRT Program team was formed on or about September 2004.  Its mandate was to expand GE's ZVRT capability beyond the 100 milliseconds that the GEIS converters had achieved in mid-2003.  *MHI*, 946 F. Supp. 2d at 597.  Later, this team also became responsible for writing patent applications (including the '705 patent) in accordance with GE's patent quotas.  To achieve these goals, the ZVRT Program team held weekly meetings on their progress.  *Id.*

130.  The Grid Interconnect IP team was formed on or around June 2006, roughly six months after work began on the '705 application.  Its stated purpose was to "review existing patents, find gaps in IP coverage and develop a strategy in developing new IP concepts."  *Id.* at 598.  The Grid Interconnect IP team "reviewed and analyzed competitors' ZVRT capabilities."  *Id.* at 610.  The team's key work product consisted of multiple, competitor-specific spreadsheets identifying,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 37 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

describing, and ranking *key competitor prior art* in the field of grid interconnection. *Id.* at 610.

### James "Jim" McGinness—Chief IP Counsel

131.   Jim McGinness owed a duty of candor to the PTO.  McGinness is named on the face of the '705 patent as a prosecuting attorney, and testified at the *MHI* inequitable conduct trial not only that he "managed the preparation and prosecution" of the '705 patent, but also that he sent prior art to outside counsel "with the instruction to cite" it.  *MHI* Trial Tr. 3A at 65:7-15.  He also testified that he had understood that he was under a duty "to disclose all the information" that was known to him "to be material to the patentability of" the '705 application.  *Id.* at 33:5-8, 34:7-11.

132.   Before and during the prosecution of the '705 patent, McGinness served as an advisor to the ZVRT Program and Grid IP Interconnect teams.  As a result of his involvement with these two teams, McGinness "personally encountered the prior art when sending the '705 application to the PTO." *MHI*, 946 F. Supp. 2d at 609.

133.   ***Erdman '083.***  McGinness knew of Erdman '083.  On May 8, 2006, after GE began working on the '705 application and approximately five months before the application was filed, McGinness sent an email to James Lyons, Chief Engineer at GE Wind, which contained a copy of Erdman '083 and an "an Excel chart describing Erdman." *MHI*, 946 F. Supp. 2d at 610.  In June 2006, he "highlighted in yellow the portion of the Excel sheet describing Erdman." *Id.*  On October 25, 2007, he again emailed Erdman to a GE patent attorney.  On April 21, 2009, "shortly before GE's 2009 amendment to the '705 patent application," McGinness received the issued Erdman patent from an analyst at GE. *Id.*

134.   On information and belief, McGinness knew that Erdman '083 was material to the '705 patent.  McGinness was aware of the scope of the '705 application.  In addition, because of his involvement with the Grid Interconnect IP team, he received a spreadsheet which identified, described, and ranked key

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 38 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

competitor prior art, including Erdman.  As detailed above in paragraph 133, McGinness emailed Erdman to various GE employees at least twice and highlighted the entry describing Erdman in a spreadsheet containing other competitor prior art, indicating he was aware of its importance.

135. ***Nielsen '936.*** McGinness was aware of Nielsen '936.  In February 2006, McGinness requested and "received research on competitor grid interconnect IP that yielded Nielsen '936." *MHI*, 946 F. Supp. 2d at 610.  In September 2006, he received a Grid Interconnect IP team spreadsheet which described and ranked twelve key Vestas patents, including Nielsen '936. *Id.*  In January 2007, McGinness circulated another spreadsheet of Vestas patents, which included Nielsen '936, for the purposes of discussing possible "cross licensing opportunities with Vestas." *Id.*

136. McGinness knew that Nielsen '936 was material to the '705 patent.  For example, he conceded materiality at the *MHI* inequitable conduct trial, testifying that, "[t]o the extent that I was aware of [Nielsen '936], I would disclose it.*"* MHI Trial Tr. 3A at 121:24-123:5.  Furthermore, as detailed above in paragraph 135, McGinness encountered Nielsen '936 in contexts that would have made him aware that Nielsen '936 was material to GE's ZVRT effort, including the Grid Interconnect IP team's list of key Vestas prior art.

137. ***Wobben '941.*** McGinness was aware of Wobben '941.  In May 2004, McGinness negotiated a cross-license with Enercon which included rights to Wobben '941.  In September 2006, McGinness received an abstract that was used "to identify key Enercon IP on grid connection," and which "described and ranked Wobben '941." *MHI*, 946 F. Supp. 2d at 610.

138. On information and belief, McGinness knew that Wobben '941 was material to the '705 patent.  McGinness was aware of the scope of the '705 application.  As detailed above in paragraph 137, McGinness encountered Wobben '941 multiple times in contexts that would have made him aware that it was highly relevant and material to GE's ZVRT effort, including his cross-licensing

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 39 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

negotiations with Enercon and the Grid Interconnect IP team's list of key Enercon prior art.

139. **GE's Prior Uses.** McGinness was aware of "the capabilities of GE's own converter." In 2008, before the 2009 amendment of the '705 patent, McGinness received a "spreadsheet showing that 80% of the wind turbines installed by GE through November 2006 [*i.e.*, before the '705 filing date] used GEIS converters." *MHI*, 946 F. Supp. 2d at 610.

140. On information and belief, McGinness knew that the public prior uses of GEIS converters at Colorado Green, Cowboy Wind, and Sweetwater were material to the '705 patent. McGinness knew, for example, that the GEIS converters were capable of ZVRT, and that the '705 application was broadly directed to ZVRT and was intended to protect GE's own turbines.

141. McGinness did not disclose any of these references, uses, or sales to the PTO during the initial prosecution of the '705 application, despite his knowledge that each was but-for material.

142. In addition to committing inequitable conduct during the initial prosecution of the '705 patent, McGinness also committed inequitable conduct during the subsequent reexaminations.

143. **Bolik and Saylors Papers and Presentations.** McGinness was aware of the Bolik and Saylors references at the time of the '633 reexamination because: (1) they were asserted against GE during the *MHI* litigation; and (2) they were discussed extensively during the *MHI* inequitable conduct trial, during which McGinness appeared on behalf of GE for each of the six days that the court was in session and during which he testified as a witness. McGinness knew that the Bolik and Saylors references were but-for material to the '705 patent because of the *MHI* inequitable conduct ruling. Yet McGinness did not disclose the Bolik and Saylors references to the PTO during the '633 and '587 reexaminations, despite his knowledge of their materiality.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 40 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

### *Nicholas "Nick" Miller—Power Systems Engineer*

144.   Nick Miller was substantively involved in the preparation of the '705 application, and therefore owed a duty of candor to the PTO.  During the *MHI* inequitable conduct trial, Scott Frame, a project lead at GE, testified that Miller participated in the preparation of the application.  *MHI* Trial Tr. 5A at 70:2-7.  Miller also reviewed the invention disclosure.  *Id.* at 23:1-24:19.

145.   At the time of the prosecution of the '705 patent, Miller was a member of the ZVRT Program and Grid Interconnect IP teams, working under McGinness's supervision.  "A key part of Miller's job was to stay abreast of and report on industry developments."  *MHI*, 946 F. Supp. 2d at 614.  To that end, he traveled to various wind conferences in the period leading up to and during the prosecution of the '705 patent, and was familiar with the ZVRT capabilities of GE's competitors as well as the general state of the wind industry.  *Id.*  Thus, as part of his involvement with the Grid Interconnect IP team, Miller received a significant amount of competitor prior art as well as information about industry grid code standards around the world.

146.   ***Bolik Papers and Presentation.***  Miller was aware of both Bolik Papers and the Bolik Presentation.  In June 2003, Miller attended the Madrid conference at which Bolik presented her first paper.  Miller also emailed a copy of the June 2003 paper to Robert Delmerico.  In October 2003, Miller sat on the same panel as Bolik as she presented her second paper, which described turbines capable of achieving ZVRT for 200 milliseconds.  *MHI* Trial Tr. 5A at 10:23-11:20.  Miller was therefore also aware of the Bolik October 2003 Paper and Presentation.  The panel on which Bolik, Miller, and Enercon engineer Stefan Hartge sat was memorialized in the conference agenda:

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 41 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

---

**14:00-15:15 Session 7**

14.00-15.00 Presentations: **Grid Integration Issues II**
(20 minutes each)

- *Grid Requirements Challenges For Wind Turbines,* Sigrid Bolik, Vestas Wind Systems, Denmark;

- *Power System Dynamic Performance Improvements From Advanced Power Control Of Wind Turbine-Generators,* Nicholas W. Miller, GE Power Systems, USA;

- *Ride-Through Capability of ENERCON-Wind Turbines,* S. Hartge, ENERCON GmbH, Aurich, Germany; V. Diedrichs Power System Software&Swervice GmbH, Wilhelmhaven, Germany.

---

FOURTH INT'L WORKSHOP ON LARGE-SCALE INTEGRATION OF WIND POWER AND

TRANSMISSION NETWORKS FOR OFFSHORE WIND FARMS 6 (2003)

On January 21, 2004, Miller attended an AWEA Grid Code meeting in Reno, Nevada, at which Saylors referred to the Bolik Paper (October 2003) and accompanying presentation. Saylors emailed the paper to Miller the next day, and on January 23, 2004, Miller forwarded it to Delmerico and Lyons, noting that it was a "[g]ood survey of Vestas' take on grid codes, and their claimed performance on LVRT.*" MHI* Trial Tr. 5A at 12:2-5; DTX-1741 (Dkt. 745.17 at 33), *MHI*, 946 F. Supp. 2d 582 (No. 3:10-cv-276) (N.D. Tex. 2013).

147.   On information and belief, Miller knew that the Bolik Papers and Presentation were material to the '705 patent. For example, Miller knew that the '705 patent was directed to controls-based ZVRT, and also knew that the Bolik Papers and Presentation described a "controls-based solution" "for ZVRT," in which "the turbine will always remain connected to the grid." *MHI*, 946 F. Supp. 2d at 615*; MHI* Trial Tr. 5A at 14:17-15:5.

148.   ***Saylors Presentation.*** Miller was aware of the Saylors presentation. On or about October 20, 2003, the day of Saylors' presentation at the New England Power Pool, Miller received the presentation from Kevin Mancouski of the New England Independent System Operator. *MHI* Trial Tr. 5A at 10:1-8. Miller then "forwarded the Saylors presentation," *MHI*, 946 F. Supp. 2d at 614, to Lyons,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 42 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

Delmerico, and Larsen, among others, with the note: "In case you haven't seen it, Vestas LVRT offering for 60 hertz U.S. market *0 volts for 600 ms on the v47* – Hawaii project.  Are we still in the game there? looks like *0% for 200ms on V80."* *MHI* Trial Tr. 5A at 10:9-20 (emphases added); DTX-2297 (Dkt. 745.19 at 26), *MHI*, 946 F. Supp. 2d 582 (No. 3:10-cv-276) (N.D. Tex. 2013).

149.  On information and belief, Miller knew that the Saylors Presentation was material to the '705 patent, for example, because Miller expressed concern about the implications of Vestas's zero-voltage ride through capability for GE's own ZVRT development efforts, and  specifically identified the Saylors Presentation as being indicative of Vestas's ability to achieve "0 volts" and "0%" ride through for 200 to 600 milliseconds.  Miller also knew that the '705 patent was broadly directed to ZVRT.

150.  *Hartge and Wobben '941.*  Miller was aware of both Wobben '941 and Hartge.  Miller sat on the same panel as Hartge when he presented the Wobben '941 method at the Fourth International Workshop in Denmark, as set forth in paragraph 146 above, and also testified that he was present for Hartge's presentation.  *MHI* Trial Tr. 5A at 11:16-20.

151.  On information and belief, Miller knew that Wobben '941 and Hartge were material to the '705 patent.  Miller knew, for example, that a "three-phase fault" is a zero-volt fault,  *MHI* Trial Tr. 5A at 30:11-13, and that Wobben '941 provides a solution for riding through a "3-phase fault F with zero impedance."  Miller also knew that the '705 patent was broadly directed to ZVRT.

152.  *Nielsen '936.*  Miller was aware of Nielsen '936.  In August and September 2004, he "received and discussed the Nielsen '936 patent," specifically whether GE products were infringing Nielsen '936, with Frame, Delmerico, and Art Romano, another GE employee.  In particular, Miller commented that "it seems like claims 1a and 3 might interfere with" nascent ZVRT ideas at GE.  *MHI* Trial Tr. 5A at 16:21-17:13.  Then, again, in September 2006, just before the '705 application

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 43 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  was filed, Miller reviewed and analyzed Nielsen '936 as part of his role on the Grid
2  Interconnect IP team.

3      153.  On information and belief, Miller knew that Nielsen '936 was material
4  to the '705 application.  For example, he expressed his concern that Nielsen '936
5  could interfere with GE's internal development of ZVRT technology.  Miller knew
6  that Nielsen '936 was directed to ZVRT technology, and that the '705 application
7  was likewise broadly directed to ZVRT.

8      154.  ***Erdman '083.***  Miller was aware of Erdman '083.  In September 2005,
9  Miller cited Erdman '085 as prior art on another patent for which he was a co-
10  inventor.  *MHI*, 946 F. Supp. 2d at 614-15.  Erdman '083 was also listed in the Grid
11  Interconnect IP team's compilation of key Clipper WindPower prior art.
12  Furthermore, on April 21, 2009, "shortly before GE's 2009 amendment to the '705
13  patent application," Miller, like McGinness, received the issued Erdman patent from
14  an analyst at GE.  *Id.* at 610.

15      155.  On information and belief, Miller knew that Erdman '083 was but-for
16  material to the '705 application.  Miller knew, for example, that Erdman was
17  identified as key Clipper WindPower prior art just prior to the filing of the '705
18  application.  Miller also knew of Erdman's contents, including that Erdman
19  addresses zero-voltage faults, to which the '705 application is broadly directed.

20      156.  ***GE's Prior Public Uses.***  Miller was aware of at least Colorado Green.
21  In May 2005, Miller "published a paper touting Colorado Green as a model for how
22  wind farms could ride through six-cycle (100 ms) three-phase (zero volt) faults at
23  the point of interconnection."  *MHI*, 946 F. Supp. 2d at 606.  He also admitted at
24  trial that his paper "indicates clearly in the simulation that Colorado Green rode
25  through a zero volt fault and remained connected to the grid."  *Id.*

26      157.  On information and belief, Miller knew that the public prior use of
27  GEIS converters at Colorado Green was material to the '705 patent.  Miller not only
28  knew, but wrote and published, that the GEIS converters and turbines installed at

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 44 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1    Colorado Green were capable of ZVRT for 100 ms.  Miller also knew that the '705

2    application was broadly directed to ZVRT.

3         158.  Miller did not disclose any of these references, uses, or sales to the

4    PTO.  Nor did Miller disclose *any* other wind turbines, grid codes, or art from the

5    wind industry that would have indicated widespread industry usage of controls-

6    based methods for achieving ZVRT.

7                    ***Einar Larsen—Co-Inventor and Power Systems Engineer***

8         159.  As a named co-inventor on the '705 patent, Larsen owed a duty of

9    candor to the PTO during the prosecution of the '705 patent.  *MHI*, 946 F. Supp. 2d

10   at 616.  Like McGinness and Miller, Larsen was a member of the ZVRT Program

11   and Grid Interconnect IP teams.  Larsen worked closely with Miller.

12        160.  ***Saylors Presentation.***  Larsen was aware of the Saylors Presentation,

13   which he received in an October 2003 email from Miller.  As alleged above in

14   paragraph 148, Miller expressed in this email that Vestas appeared to have ZVRT

15   capability at 600 ms.

16        161.  On information and belief, Larsen knew that the Saylors Presentation

17   was but-for material to the '705 application. Larsen knew that the Saylors

18   Presentation was directed to ZVRT capability, and that the '705 application was

19   broadly directed to ZVRT.

20        162.  ***GE's Prior Uses.***  Larsen had a "key role" in "developing and testing

21   the GEIS . . . converter capable of providing ZVRT for commercial wind turbines."

22   *MHI*, 946 F. Supp. 2d at 616.  Larsen was involved, for example, in directing the

23   June 2003 tests of the GEIS converter in Salem, Virginia.  On June 19, 2003, he sent

24   an email to the Salem team directing them to do rigorous ZVRT tests, and to

25   "include the worst possible faults" in those tests.  *Id.* at 616*; MHI* Trial Tr. 4 at 5:7-

26   6:3.  On information and belief, Larsen was aware of Colorado Green, Cowboy

27   Wind, and Sweetwater, given his extensive involvement with GEIS converter testing

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 45 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1   and the fact that all three wind farms used the same GEIS converters that were

2   tested at Salem and Tehachapi.

3       163.   On information and belief, Larsen knew that the public prior uses of

4   GEIS converters at Colorado Green, Cowboy Wind, and Sweetwater were material

5   to the '705 patent.  Larsen himself directed the ZVRT tests at Salem and Tehachapi

6   that led to GE commencing commercial production of the GEIS converters, and

7   knew that the tests were successful.  Larsen also knew that the '705 application was

8   broadly directed to ZVRT.

9       164.   Larsen did not disclose any of these references, uses, or sales to the

10   PTO during the initial prosecution of the '705 patent.

11                    ***Scott Frame—Project Leader***

12       165.   Scott Frame was substantively involved in the preparation of the '705

13   application, and therefore owed a duty of candor to the PTO.  Frame testified at the

14   *MHI* inequitable conduct trial that he "participated in the preparation of the ['705]

15   application."  *MHI* Trial Tr. 5A at 70:2-4.  His involvement was substantial.  In his

16   capacity as "project leader," Frame served as the "liaison," *MHI*, 946 F. Supp. 2d at

17   617, coordinating and participating in communications "between the inventors, the

18   engineers on the team, and the attorneys who were preparing the application*," MHI*

19   Trial Tr. 5A at 69:6-14, 69:20-70:1.

20       166.   Frame, like the other inequitable conduct actors, was a member of both

21   the ZVRT Program and Grid Interconnect IP teams.   In 2004, Frame was

22   responsible for leading the "ZVRT project through initial project phases including

23   project planning, requirements decision and preliminary analysis*." MHI* Trial Tr.

24   5A at 66:2-8.

25       167.   ***GE's Prior Uses***.  Frame knew about the sales of GE's ZVRT-capable

26   turbines using GEIS converters, including Colorado Green, Cowboy Wind, and

27   Sweetwater I.  In June 2003, as a member of the GE Wind team, Frame "led the

28   effort to complete" the testing of the GEIS converters.  *MHI* Trial Tr. 5A at 64:13-

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 46 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

24.  After the successful test, Frame then released the GEIS converter "to GE wind production."   He also claimed responsibility for selling and "successfully commission[ing]" the GEIS converters to customer sites, specifically "Colorado Green and Sweetwater."  *Id.* at 65:3-11; *MHI*, 946 F. Supp. 2d at 618.  In addition, Frame admitted at trial that he knew the ZVRT-capable GEIS converter was installed at Cowboy Wind by the time the '705 application was filed.  *MHI* Trial Tr. 5A at 104:2-5.

168.  On information and belief, Frame knew that the public prior uses of GEIS converters at Colorado Green, Cowboy Wind, and Sweetwater were material to the '705 patent.  Frame not only "led the effort" in ensuring the GEIS converter testing was completed, but also gave the green light to start producing the ZVRT-capable GEIS converters for sale.  Frame also knew that the '705 application was broadly directed to ZVRT.

169.  ***Nielsen '936.***  Frame was aware of Nielsen '936.  He received a copy of Nielsen '936 at least four times. The first two times were in August and September 2004, including a September 2, 2004 email in which another GE employee expressed concern that GE products could possibly infringe Nielsen '936.  *MHI* Trial Tr. 5A at 16:13-25.  Frame later became a member of the Grid Interconnect IP team, which was formed after GE began work on the '705 application.  *MHI*, 946 F. Supp. 2d at 617.  In his capacity as a member of this team, Frame "would have been in a position to receive all reports from ZVRT co-member Miller."  *Id.*  In addition, Frame was part of the Grid Interconnect IP team that worked to "identify key competitor prior art," including Nielsen '936.  *Id.* at 618.  On February 20, 2008, "Frame received yet another copy of Nielsen."  *Id.*

170.  On information and belief, Frame knew that Nielsen '936 was material to the '705 application.  For example, he was included on the email conversation in which several GE employees, including Miller and Delmerico, discussed whether Nielsen '936 anticipated GE's ZVRT technology and whether existing GE products

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 47 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

infringed Nielsen '936.  Frame also knew that Nielsen '936 was a key piece of Vestas prior art that was directed to ZVRT technology, and that the '705 application was likewise broadly directed to ZVRT.

171. ***Wobben '941.*** Frame knew of Wobben '941.  In his capacity as a member of the Grid Interconnect IP team, Frame identified and encountered Wobben '941 as a piece of key Enercon prior art.

172.  On information and belief, Frame knew that Wobben '941 was material to the '705 application.  As the new production leader assigned to the ZVRT-capable GEIS converter*, MHI Trial Tr.* 5A at 64:3-5, and as the founding project leader for the ZVRT Program team, *id.* at 66:2-8, Frame was familiar with ZVRT technology.  Frame also claimed, as one of his personal achievements, that he "led ZVRT project through technology development phases including detailed design, initial validation and IP protection." *Id.* at 67:6-11.  Frame thus understood ZVRT technology, as well as how it was developed.  Thus, Frame also knew that Wobben '941 provides a ZVRT solution, and that the '705 application was broadly directed to ZVRT.

173.  Frame did not disclose any of this prior art to the PTO during the initial prosecution of the '705 patent.

### Robert "Bob" Delmerico—Principal Engineer

174.  Bob Delmerico was substantively involved with the prosecution of the '705 patent.  Delmerico, like Frame, helped facilitate the '705 patent application by coordinating and participating in communications between the inventors, engineers, and attorneys.  *MHI*, 946 F. Supp. 2d at 620; *MHI* Trial Tr. 5A at 102:25-103:11.  Delmerico's name also "appear[ed] in 350 entries on GE's privilege log" in the *MHI* inequitable conduct trial, including 163 emails involving McGinness, and 14 involving GE's outside patent prosecution counsel.  *MHI*, 946 F. Supp. 2d at 619, 20-21.  Delmerico thus owed a duty of candor to the PTO.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 48 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

175.   ***Bolik Papers.***   Delmerico was aware of both Bolik Papers.  In January 2004, he received an email from Miller containing the October 2003 Bolik Paper. The June 2003 Bolik Paper was also found in Delmerico's files.

176.   On information and belief, Delmerico knew that the Bolik Paper and Presentations were material.  At the time of the prosecution of the '705 patent, Delmerico was a Principal Engineer at GE and a member of both the ZVRT Program and Grid Interconnect IP teams, and would have understood ZVRT technology.  Delmerico also knew that the Bolik Paper and Presentations were directed to ZVRT technology, and that the '705 application was likewise broadly directed to ZVRT.

177.   ***Nielsen '936.***   Delmerico was aware of Nielsen '936.  Delmerico received copies of Nielsen '936 in August and September 2004, including a September 2, 2004 email in which another GE employee, a patent engineer, expressed concern that GE products could possibly infringe Nielsen '936, or that Nielsen '936 might anticipate nascent GE ZVRT ideas.  *MHI* Trial Tr. 5A at 16:13-25.  Delmerico later became a member of the Grid Interconnect IP team, which was formed after GE began work on the '705 application.  *MHI*, 946 F. Supp. 2d at 617. In his capacity as a member of this team, in September 2006, Delmerico also identified, reviewed, and analyzed the claims of Nielsen '936.  *Id.* at 618.

178.   On information and belief, Delmerico knew that Nielsen '936 was material to the '705 application.  At the time of the prosecution of the '705 patent, Delmerico was a Principal Engineer at GE, and would have understood ZVRT technology.  In addition, he was included on the email conversation in which several GE employees, including Miller and Frame, discussed whether Nielsen '936 anticipated GE's ZVRT technology and whether existing GE products infringed Nielsen '936.  Delmerico also knew that Nielsen '936 was a key piece of Vestas prior art that was directed to ZVRT technology, and that the '705 application was likewise broadly directed to ZVRT.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 49 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

179.  ***Wobben '941.***  Delmerico was aware of Wobben '941. Delmerico reviewed Wobben '941 as part of a policy instituted by McGinness, requiring engineers to review all reports and key competitor IP and to keep the legal team apprised of "any patents deemed relevant or a concern."  DTX-2529 (Dkt. 745.20 at 26), *MHI*, 946 F. Supp. 2d 582 (No. 3:10-cv-276) (N.D. Tex. 2013).  In July 2005, Delmerico wrote in an email circulated to management at GE Wind, including McGinness, that he had "completed initial review" of Wobben '941."  *MHI* Trial Tr. 3A at 107:11-23; *MHI*, 946 F. Supp. 2d at 620.

180.  On information and belief, Delmerico knew that Wobben '941 was material to the '705 application.  For example, Delmerico identified Wobben '941 as a patent that was "relevant and of concern" to GE's advances in ZVRT.  *MHI*, 946 F. Supp. 2d at 619.  Furthermore, at the time of the prosecution of the '705 patent, Delmerico was a Principal Engineer at GE, and would have understood ZVRT technology.  Delmerico therefore also knew that Wobben '941 provides a ZVRT solution, and that the '705 application was broadly directed to ZVRT.

181.  ***Erdman '083.***  Delmerico was aware of Erdman '083.  A copy of the patent was found in his files.  He also received Erdman '083 as part of his involvement with the Grid IP Interconnect team.  *MHI*, 946 F. Supp. 2d at 620.

182.  On information and belief, Delmerico knew that Erdman '083 was material to the '705 application.  At the time of the prosecution of the '705 patent, Delmerico was a Principal Engineer at GE, and would have understood ZVRT technology.  Delmerico therefore also knew that Erdman '083 provides a ZVRT solution, and that the '705 application was broadly directed to ZVRT.

183.  Delmerico did not disclose any of this prior art to the PTO during the initial prosecution of the '705 patent.

### SPECIFIC INTENT TO DECEIVE THE PTO

184.  On information and belief, Jim McGinness, Nick Miller, Einar Larsen, Scott Frame, and Bob Delmerico withheld but-for material prior art and prior public

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 50 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

uses with the specific intent to deceive the PTO in order to obtain issuance of the broad claims of the '705 patent.

185.   These omissions were significant.   As pointed out by the *MHI* court after the six-day inequitable conduct trial, the GE employees "did not merely fail to disclose one patent, or even two; instead, they failed to disclose **all** of the relevant wind turbines dominating the market at the time."  *MHI*, 946 F. Supp. 2d at 591.

### *Every GE Actor Withheld Prior Art with the Specific Intent to Deceive*

186.   ***Jim McGinness.***  On information and belief, McGinness disclosed only Janssen '188, which provides LVRT down to only 15% of rated voltage, and omitted Erdman '083, Wobben '941, Nielsen '936, Colorado Green, Cowboy Wind, and Sweetwater with the specific intent to deceive the PTO to obtain issuance of the broad claims of the '705 patent.  McGinness made the decision to include Janssen '188 on the invention disclosure for the '705 application.  He attempted to explain this at the *MHI* trial by testifying that he had no recollection of the omitted references, and that they were not cited "because no one associated them with the '705."  *MHI*, 946 F. Supp. 2d at 612.  Under this "questionable" account of the events, seasoned ZVRT engineers, including Miller, Larsen, Frame, and Delmerico, affirmatively associated a patent application *explicitly* directed to **LVRT** with the '705—the alleged novelty of which was riding through "approximately zero volts"— while failing to associate patents and articles that explicitly provided for "zero voltage" events with the '705.  As the *MHI* court incredulously stated: "McGinness would have the Court believe that his expert engineers examined Erdman, Nielsen, and Wobben '941 and felt that ***Janssen*** was the ***only*** relevant prior art."  *MHI*, 946 F. Supp. at 612.

187.   The court was also "perplexed," for example, by McGinness's claim that the Grid Interconnect IP Team only reviewed "competitor patents and published patent applications . . . to ensure that technologies being developed for [GE] do not infringe valid third-party" IP rights.  *MHI*, 946 F. Supp. 2d at 611.  The court

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 51 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

reasoned that McGinness's "testimony seems to be an inadvertent admission that the group *was indeed* studying prior art.   If not with regard to the '705 Patent application, there is *no other credible explanation* as to why GE employees would be studying these patents."   *Id.* (second emphasis added).   This is particularly true given that the Grid Interconnect IP team was formed mere months before the '705 patent application was filed, and that among its purposes was the creation of patent applications to fulfill a quota.

188.   In addition, on information and belief, McGinness failed to disclose the Bolik and Saylors references during the '633 reexam with the specific intent to deceive the PTO, even after the *MHI* court deemed them but-for material to claims 1 and 7 of the '705 patent.   McGinness disclosed to the PTO hundreds of pages of trial transcripts and other materials from the *MHI* litigation during the course of the reexam, across multiple different filings, but nonetheless *withheld the Bolik and Saylors references themselves* each time.   This continued even after the *MHI* court issued its decision specifically finding the Bolik and Saylors references but-for material to the '705 patent.   Deceptive intent is the single most reasonable inference that can be drawn from McGinness' actions.

189.   *Nick Miller.*   On information and belief, Miller withheld prior art and prior public uses with the specific intent to deceive the PTO.   Miller's primary role at GE was to keep apprised of competing ZVRT technology, making Miller fully aware of the landscape of competitor prior art.   Miller knew that Vestas had achieved ZVRT as early as 2002, and that grid codes around the world had adopted ZVRT well before the filing of the '705 application.

190.   *Einar Larsen.*   On information and belief, Larsen withheld prior art and prior public uses with the specific intent to deceive the PTO.   Larsen was closely involved with GE's 2003 ZVRT testing of the GEIS converters, and expressed elation when the tests succeeded.   He was also aware of the commercial value of ZVRT to the market as early as 2003, writing that "if you can claim zero

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 52 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1   voltage at high side of padmount transformer then you will be untouchable." *MHI*,
2   946 F. Supp. 2d at 616.

3       191.   ***Scott Frame.***   On information and belief, Frame withheld prior art and
4   prior public uses with the specific intent to deceive the PTO.  Frame not only led
5   GE's 2003 ZVRT testing of its GEIS converters, but also was responsible for
6   releasing them to mass commercial production, and then subsequently overseeing
7   their sale and commission to various customer sites.  Frame nonetheless failed to
8   disclose GE's prior public uses of ZVRT technology.

9       192.   ***Bob Delmerico.***   On information and belief, Delmerico withheld prior
10  art and prior public uses with the specific intent to deceive the PTO.  The *MHI* court
11  found Delmerico an untrustworthy witness, and pointed out multiple "flaws in
12  Delmerico's testimony," including that it "often contradicted the evidentiary record"
13  and, like McGinness's testimony, involved "extensive" "lapses of memory."  *MHI*,
14  946 F. Supp. 2d at 619.   For example, Delmerico claimed that he "had no
15  discussions about intellectual property with respect to zero voltage ride through,"
16  despite the fact that he appeared in 350 entries on GE's privilege log, approximately
17  163 of which involved McGinness.  *Id.*

18      193.   The only reasonable inference from the circumstances surrounding the
19  '705 prosecution is that McGinness, Miller, Larsen, Frame, and Delmerico had the
20  specific intent to deceive the PTO in order to obtain issuance of the broad and
21  sweeping claims of the '705 patent. These five individuals individually and
22  collectively withheld the entire state of the art, and disclosed only a single piece of
23  prior art that GE has already represented multiple times is distinguishable from the
24  '705 patent.

25              ***There Is Overwhelming Circumstantial Evidence of***
26              ***the GE Employees' Specific Intent to Deceive the PTO***

27      194.   The *MHI* court ultimately found for GE on the issue of specific intent,
28  in a "strained holding" made with " reluctance" based on what the court erroneously

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 53 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

perceived were "the Federal Circuit's nearly insurmountable standards for deliberateness outlined in *Therasense* and *1st Media*." *MHI*, 946 F. Supp. 2d at 590. The court believed that without "conclusive documentation of a deliberate conspiracy," or a "smoking gun document," that "there can be no finding of inequitable conduct." *Id.* at 589, 591.

195.   The court also noted that this difficulty arose at least in part because the *MHI* case was "plagued by a lack of documentation due to the attorney-privilege," thus "obscur[ing] the Court's ability to fully judge the record" and preventing it from "see[ing] the full scope of GE's thought process during the application process." *Id.* The court expressed concern that "sophisticated patent applicants can assert privilege over a wide range of documents" and avoid a finding of inequitable conduct simply "by ensuring that a lawyer is always involved in the key discussions during the application process." *Id.* The court additionally lamented that, "[b]y not allowing the Court to draw a negative inference from GE's extensive use of privilege, the Federal Circuit essentially forces the Court to make a *positive* inference." *Id.* at 593.  It cautioned that such a strategy "produces a tremendous structural advantage for the party accused of inequitable conduct, while encouraging the abuse of privilege." *Id.*

196.   Despite the district court's ruling, there is substantial and overwhelming evidence of McGinness's, Miller's, Larsen's, Frame's, and Delmerico's specific intent to deceive the PTO.

197.   Federal Circuit decisions since the *MHI* litigation have made clear both that selective disclosure can serve as a basis for an inequitable conduct finding, and that district courts are permitted to draw adverse inferences of specific intent. Neither "conclusive documentation of a deliberate conspiracy" nor "a smoking gun document" are required for a finding of inequitable conduct. *See, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 768 F.3d 1185, 1190-91 (Fed. Cir. 2014) (affirming inequitable conduct because "[p]artial disclosure of material information

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 54 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective," and the patent prosecutor's "failure to disclose other information that would have prevented his patent application from succeeding 'demonstrates a deliberate process, not an accident or mistake'").   Under the current state of the law, the evidence presented in the *MHI* litigation is more than sufficient to conclude that GE engaged in inequitable conduct.

198.   McGinness, Miller, Larsen, Frame, and Delmerico each "analyzed and considered the materiality of the prior art patented by their main competitors in the wind industry," *MHI*, 946 F. Supp. 2d at 591, as set forth in paragraphs 127 to 183 above.

199.   McGinness, Miller, Larsen, Frame, and Delmerico met on October 18, 2006, "two days prior to the filing of the '705 application," to study key competitor prior art. *Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd.*, No. 3:10-cv-276, 2013 WL 12226037, at *10 (N.D. Tex. Apr. 5, 2013).

200.   McGinness, Miller, Larsen, Frame, and Delmerico individually and collectively failed to disclose "***all*** of the relevant wind turbines dominating the market at the time," effectively "omitting ***the entire state*** of the U.S. wind industry." *MHI*, 946 F. Supp. 2d at 591.   Yet all five men were members of the Grid Interconnect IP team, whose express stated purpose was to monitor key competitor prior art and the state of the wind industry.

201.   McGinness, Miller, Larsen, Frame, and Delmerico individually and collectively failed to disclose that GE itself had achieved ZVRT by mid-2003, and in fact was marketing, selling, installing, and commissioning ZVRT-capable turbines and converters for at least three years prior to the filing date of the '705 application.

202.   Instead, McGinness, Miller, Larsen, Frame, and Delmerico selectively disclosed a single outdated GE patent application on "low voltage ride through," which was "far more rudimentary than the other, more technologically-advanced

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 55 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

competitor patents." *MHI*, 946 F. Supp. 2d at 591.  These competitor patents—such as Erdman '083, Nielsen '936, and Wobben '941—explicitly provide for zero-voltage faults.   Janssen '188, on the other hand, is a "pure" LVRT patent.   Further, McGinness, Miller, Larsen, Frame, and Delmerico expressly distinguished "low voltage ride through" from "zero voltage ride through" in the '705 patent.   '705 patent at 6:63-65.  Their deliberate actions created the false impression that GE "were the first in the industry to achieve zero voltage ride through." *MHI*, 946 F. Supp. 2d at 593.

203.  The sole disclosed application eventually became the '985 patent that GE has also asserted in this case.  Even now, GE maintains that there is a significant distinction between so-called LVRT and ZVRT.

204.  During the *MHI* litigation, McGinness, Miller, Larsen, Frame, and Delmerico provided unconvincing and at times contradictory testimony, which GE was unable to explain.  The court, for example, described GE's various attempts to explain discrepancies in the trial record as "vague," *id.* at 611, "not . . . exculpatory in any way," *id.* at 612, "questionable," *id.*, not "plausible," *id.* at 615, and "unusual," *id.* at 618.

205.  These facts are sufficient themselves to establish specific intent to deceive.

206.  The '705 patent is therefore unenforceable because it was obtained through the inequitable conduct of McGinness, Miller, Larsen, Frame, and Delmerico, who intentionally and knowingly withheld numerous material prior art references and prior public uses and sales with the specific intent to deceive the PTO and obtain issuance of the '705 patent.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct: Unenforceability of the '985 Patent)

207.  The '985 patent is also unenforceable under the doctrine of inequitable conduct.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 56 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

208.  As set forth below, the patent prosecutor and the named inventors of the '985 patent deliberately elected to withhold during prosecution prior art that was material to patentability of the '985 patent.

209.  By GE's own admission, the '985 patent is directed to what GE describes as "Low Voltage Ride Through (LVRT)." *See* SAC ¶ 2.  GE contends that the '985 patent discloses techniques "to allow a wind turbine generator to remain connected to the power grid during low voltage events and to maintain functioning of the blade pitch system in spite of lack of voltage at the generator terminals during such events." *Id.*  But when GE filed the application that would become the '985 patent on January 24, 2003, these techniques had been known in the wind industry for more than a year.

210.  In particular, the GE project that resulted in the '985 patent was initiated in response to a particular prior art published grid code standard that *required* LVRT, and GE itself had prior art patents and publications that related directly to LVRT.  GE did not disclose any of this to the PTO.  Indeed, the prior art published grid code was so central to the '985 patent that GE copied a figure from it as Figure 1 of the '985 patent.  GE did not disclose the original source of the figure, nor did GE disclose anything else about the prior art published grid code to the PTO.

211.  Moreover, GE itself had prior art patents and publications that related directly to LVRT.  As far back as 1984, GE had been working on uninterruptible power supplies for wind turbines that would allow for control of the turbine blades during low voltage events.  Additionally, GE had publicly disclosed similar LVRT approaches in patents well before the filing date of the '985 patent, including in a GE patent that issued in 1999 and that named the Chief Engineer for GE Research as a co-inventor.  GE did not disclose any of this material to the PTO.  Later, when the '985 patent was subject to *inter partes* reexamination, the examiner rejected several original claims under these same prior art references.  Rather than arguing against the rejections, GE amended the claims to add numerous additional

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 57 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1 limitations, essentially conceding that the references would have invalidated the
2 original claims.

3 **THE OMITTED PRIOR ART IS MATERIAL TO THE '985 PATENT**

4      212.   Despite the fact that GE was aware of prior art relevant to LVRT, it
5 submitted only *four* references to the PTO during the prosecution of the '985 patent,
6 all in a single Information Disclosure Statement on September 9, 2004.   Thus, as
7 with the '705 patent, GE effectively omitted "the entire state of the U.S. wind
8 industry" in its submissions during prosecution.

9      213.   The omitted, material prior art includes at least the E.ON 2001
10 Standard, U.S. Patent No. 5,907,192 to Lyons, and the GE Report (each described
11 below).   Each of these prior art references was also at issue during the *inter partes*
12 reexamination of the '985 patent that resulted in the current amended claims.   Vestas
13 makes this preliminary identification of omitted, material prior art based on public
14 information currently available to it.   Vestas reserves the right to identify additional
15 omitted, material prior art, including as a result of information obtained in discovery
16 in this case.

17      214.   ***E.ON 2001 Standard***.   The reference E.ON, *Supplemental Network*
18 *Connection Rules for Wind Energy Systems, Additional Network and Organizational*
19 *Rules for Network Connection of Wind Energy Systems within the Regulation Zone*
20 *of E.ON Netz GmbH* ("E.ON 2001 Standard") is dated December 1, 2001, and is
21 prior art to the '985 patent under pre-AIA 35 U.S.C. § 102(b).   The rules in the
22 E.ON 2001 Standard applied to all wind turbines in the regulation zone of the
23 network operator E.ON Netz GmbH for which a request for grid connection was
24 made after December 1, 2001.

25      215.   The E.ON 2001 Standard requires a wind turbine to remain connected
26 to the grid and, thus, "ride through" faults of moderate severity: "If the amount of
27 the voltage at the network connection node according to Fig. 4a lies above the
28 progression shown in case of problems in the network, no automatic separation from

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 58 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

the network is allowed to take place."  E.ON 2001 Standard at 7.  The E.ON 2001 Standard mandates that if network voltage drops to a value of less than 80% of the operating voltage, automatic separation of the wind park from the network must take place no sooner than after 3 seconds and no later than after 5 seconds.  In other words, the wind turbine must stay connected to the grid for a low voltage event that lasts up to 3 seconds. The E.ON 2001 Standard also describes a low voltage event between 15% and 60% of the operating voltage.  Original claims 2-7 of the '985 patent and numerous amended claims define various ranges for a low voltage event that appear to have been taken from Fig. 4a of the E.ON 2001 Standard. Additionally, Figure 1 of the '985 patent appears to have be copied, without attribution, from Figure 4a of the E.ON 2001 Standard:

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)



Figure 1 of the '985 patent.

Figure 4a of the E.ON 2001 Standard.

216. **Lyons '192.** U.S. Patent No. 5,907,192 ("Lyons '192") issued on May 25, 1999, and is prior art to the '985 patent under 35 U.S.C. § 102(b) (pre-AIA). Lyons '192 is assigned to GE. The named inventors on Lyons '192 are James Patrick Lyons, Albert Andreas Maria Esser, and Paul Scott Bixel. Lyons was employed by GE from 1989 to 2008 and at one point held the title Chief Engineer –

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 60 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  Electrical & Electronic Technologies at GE Global Research.  As Chief Engineer,

2  Lyons supervised all research and development projects for GE Wind.  Esser also

3  worked at GE for a long period and was a Project Manager at GE's Corporate R&D

4  Center.  Bixel worked as an engineer at a joint venture between GE and Toshiba.

5     217.   Figure 1 of Lyons '192 depicts a wind turbine that adjusts the pitch of

6  the blades in response to a loss of grid power by using an emergency power system,

7  including a capacitor UPS, as a backup power source:



22  Lyons '192 teaches that control system 110 senses undervoltage conditions in the

23  grid converter 102 and sends a signal to other components to change their mode of

24  operation.  Control system 110 commands the hub pitch controller 111 to initiate a

25  rapid pitch change of the electric pitch actuator 112.  The emergency power system,

26  including capacitors 103 and 105, provides an uninterruptible power supply that

27  supplies power to the electric pitch actuator 112, hub pitch controller 111, and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

control system 110 during a grid power loss or under-voltage event. This allows the turbine to "ride through most utility grid outages." Lyons '192 at 2:38-52.

218.   Among other claims, original claim 1 was rejected during the reexamination as obvious in light of the combination of Lyons '192 and GE Report (described below).     September 30, 2011 Office Action in *Inter Partes* Reexamination at 17-25.   Original claim 1 (and other claims) were also rejected as anticipated by Lyons '192 alone. *Id.* at  32.   The examiner included detailed observations listing numerous claim elements disclosed by Lyons '192, including a low voltage event detector and a blade pitch control system that can vary the pitch of the blades. *Id.* at 24-25. In particular, the examiner found that "Lyons ['192] teaches a UPS that provides power to the turbine controller and the blade pitch control system during a low voltage event." *Id.* at 25.   The examiner also specifically found, over arguments made by GE, that "the capacitors [in Lyons '192] meet the definition of a UPS in the '985 patent." *Id.* at 67.   Similarly, the examiner found that, contrary to GE's position, that the UPS in Lyons '192 "is connected to the turbine controller and with the blade pitch control system to provide power during a low voltage event." *Id.*

219.   In response to the rejection of the original claims under Lyons '192 and GE Report, GE amended claims 1 and 6 "to more particularly claim low voltage events . . . .   In particular, the claimed generator is required to remain connected to the grid during a low voltage event; and the low voltage is defined as a voltage in which the grid voltage drops to less than 50% (amended claim 1), or to 15-50% (amended claim 6) of a rated voltage of the generator."   December 28, 2011 Response in *Inter Partes* Reexamination.   These amended claims ultimately issued from the reexamination.   Thus, the examiner's rejections under Lyons '192 and GE's response to amend the rejected claims demonstrate that Lyons '192 is a but-for material prior art reference to the original claims.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 62 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

220.  ***GE Report.***  The MOD-5A Wind Turbine Generator Program Design Report, Vols. 1-4, August 1984 ("GE Report") is prior art to the '985 patent under pre-AIA 35 U.S.C. § 102(b).  The GE Report was prepared by the Advanced Energy Programs Department at GE for the U.S. Department of Energy's Division of Wind Energy Technology.  The GE Report discloses a MOD-5A wind turbine including a protection circuit in the form of a machine side thyristor controlled resistive shunt. The GE Report also discloses a power converter, a control circuit, and a UPS: "[The] uninterruptible power supply provides power for the instrumentation and controls when utility power is interrupted, to facilitate shutdown and enable the wind turbine to start and continue operation when the utility power is restored."  GE Report, vol. 1, executive summary, p. 18.  The UPS powers "sensors and actuators": "An uninterruptible power supply at 120 VAC shall be provided with suitable rating to operate the control system for a minimum of 30 minutes, including sensor and actuators."  GE Report, vol. 2, book 2, appendix a, § 3.2.2.2.2.5 at p. 26.  The examiner in the *inter partes* reexamination found that it would have been obvious to substitute ailerons as described in the GE Report with a blade pitch control system as described, for example, in Lyons '192.  December 21, 2010 Office Action in *Inter Partes* Reexamination.

221.  Among other claims, original claim 1 was rejected during the reexamination as obvious in light of the combination of Lyons '192 and the GE Report.  September 30, 2011 Office Action in *Inter Partes* Reexamination at 17-25. The examiner included detailed observations listing numerous claim elements disclosed by the GE Report.  *Id.*  The examiner also specifically found, over arguments made by GE, that the GE Report disclosed "a low voltage event where the UPS powers the blade controller."  *Id.* at 54.

222.  As described earlier in the context of Lyons '192, in response to the rejection of the original claims under Lyons '192 and the GE Report, GE amended claims 1 and 6.  December 28, 2011 Response in *Inter Partes* Reexamination.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 63 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

These amended claims ultimately issued from the reexamination.   Thus, the examiner's rejections under the GE Report and GE's response to amend the rejected claims demonstrate that the GE Report is a but-for material prior art reference to the original claims.

### GE'S AWARENESS OF THE OMITTED PRIOR ART
### AND ITS MATERIALITY

223.   On information and belief, at least patent prosecutor Paul Mendonsa and named inventors Wilhelm Janssen, Henning Luetze, Andreas Buecker, Till Hoffmann, and Ralf Hagedorn were aware of the omitted prior art and its materiality.

224.   For example, all of the named inventors of the '985 patent were well aware of the E.ON 2001 Standard, because they were working on a project to provide LVRT capabilities in GE's wind turbines to comply with the standard. *Gen. Elec. Co. v. Wilkins*, No. 1:10-cv-00674, 2012 WL 5989349, at *4-6 (E.D. Cal. Nov. 29, 2012).   Prior counsel for GE characterized the E.ON 2001 Standard as the "specific motivation" for the work that led to the '985 patent. *Wilkins* Trial Tr. at 66:1-5 ("Your Honor will learn from the evidence that in Salzbergen, there was a specific motivation, one major European utility had imposed a requirement for low voltage ride through, it was called the 'E.On,' and it requires that you be able to do low voltage ride through down to 15 percent.").   In fact, named inventor Wilhelm Janssen was aware as early as 2000 that the E.ON 2001 Standard was about to issue and "he was trying to figure out what to do with the wind turbine in order to meet his ride through requirements. *Id.* at 170:11-21.   The named inventors were familiar with the voltage ride through levels specified in the E.ON 2001 Standard.   *Id.* at 207:12-21.   Furthermore, notes for a December 9, 2002 conference call submitted by GE during the reexamination as purporting to support a conception date for the '985 patent describe "[t]echnical solutions for ride through capability to meet E-ON

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 64 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1   requirements."   On information and belief, Mendonsa became aware of the E.ON

2   2001 Standard during the prosecution of the '985 patent.

3      225.   On information and belief, the previous approaches that GE had taken

4   to the exact same LVRT problem, as described at least in Lyons '192 and the GE

5   Report, were also well known to Mendonsa and to the named inventors.  Documents

6   submitted by GE during the reexamination establish that James Lyons, the first

7   named inventor on Lyons '192, was deeply involved in the work that led to the '985

8   patent.   For example, Lyons was included on numerous email chains that also

9   included named inventors of the '985 patent.  In the reexamination, GE contended

10  that these emails supported a conception date for the '985 patent.

## SPECIFIC INTENT TO DECEIVE THE PTO

12     226.   On information and belief, at least patent prosecutor Paul Mendonsa

13  and named inventors Wilhelm Janssen, Henning Luetze, Andreas Buecker, Till

14  Hoffmann, and Ralf Hagedorn withheld but-for material prior art with the specific

15  intent to deceive the PTO in order to obtain issuance of the '985 patent.

16     227.   For example, the substantial similarity between Figure 1 of the '985

17  patent and Figure 4a of the E.ON 2001 Standard demonstrates a deliberate failure to

18  disclose but-for material prior art to the PTO.  The reasonable inference supported

19  by the similarity of the figures is that GE copied, without attribution, portions of the

20  E.ON 2001 Standard to include in the '985 patent.

21     228.   Moreover, just as with the '705 patent, the minimal set of references

22  disclosed by GE, compared to the advanced state of LVRT technology at the date of

23  filing, demonstrates a deliberate failure to disclose but-for material prior art to the

24  PTO during prosecution of the '985 patent.  The entire state of the wind turbine

25  industry was omitted.

26     229.   The '985 patent is therefore unenforceable because it was obtained

27  through the inequitable conduct of the patent prosecutor and named inventors, who

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

- 65 -

1  intentionally withheld numerous prior art references with the specific intent to
2  deceive the PTO and obtain issuance of the '985 patent.

3              **RESERVATION OF ADDITIONAL DEFENSES**

4        230.   Vestas asserts all other affirmative defenses that may become available
5  as a result of information developed during discovery, trial, or otherwise, and
6  reserves the right to seek leave to amend its Answer to plead additional defenses, or
7  to supplement existing defenses.

8                    **PRAYER FOR RELIEF**

9  WHEREFORE, Vestas respectfully requests the following relief:

10       (a)    That GE's claims for relief are denied;

11       (b)    That the SAC be dismissed with prejudice;

12       (c)    That the Court enter judgment against GE and in favor of Vestas Wind
13  Systems and Vestas-American;

14       (d)    That the Court determine that this is an exceptional case under 35
15  U.S.C. § 285 and award attorneys' fees and costs to Vestas Wind Systems and
16  Vestas-American; and

17       (e)    Such other and further relief as the Court may deem just and proper.

18

19                **AMENDED COUNTERCLAIMS**

20       Vestas Wind Systems A/S ("Vestas Wind Systems") and Vestas-American
21  Wind Technology, Inc. ("Vestas-American") bring these counterclaims against
22  General Electric Co. ("GE"), and allege as follows:

23                      **THE PARTIES**

24       1.     Vestas Wind Systems is a corporation organized and existing under the
25  laws of Denmark, having its principal place of business at Hedeager 42, 8200
26  Aarhus N, Denmark.

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 66 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

2.      Vestas-American is a corporation organized and existing under the laws of the State of California, having its principal place of business at 1417 NW Everett Street, Portland, Oregon 97209.

3.      Vestas Wind Systems and Vestas-American are informed, and on that basis allege, that GE is a corporation organized and existing under the laws of the State of New York, having a principal place of business at 41 Farnsworth Street, Boston, Massachusetts 02210.

## JURISDICTION AND VENUE

4.      This action arises under the patent laws of the United States of America, 35 U.S.C. §§ 1 *et seq*.  This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

5.      This Court has personal jurisdiction over GE because it invoked the jurisdiction of this Court by filing this action.

6.      Venue in this judicial district is proper over these Counterclaims pursuant to 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

7.      On or about November 16, 2017, GE filed a Second Amended Complaint ("SAC") against Vestas Wind Systems and Vestas-American, asserting infringement of two patents.

8.      In the SAC, GE alleges that it is the legal owner by assignment of U.S. Patent Nos. 6,921,985 ("the '985 patent") and 7,629,705 ("the '705 patent").

9.      In the SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '985 and '705 patents.  Vestas Wind Systems and Vestas-American have denied each and every such allegation.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 67 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

## COUNTERCLAIMS OF VESTAS WIND SYSTEMS
## AND VESTAS-AMERICAN

## FIRST COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '985 Patent)

10.     Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims as if fully set forth herein.

11.     In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '985 patent.

12.     As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas American with regard to infringement of the '985 patent.

13.     A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights with respect to the '985 patent.

14.     By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that they do not infringe the '985 patent, either directly or indirectly, literally or under the doctrine of equivalents, and are not liable for any alleged infringement of the '985 patent.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '985 Patent)

15.     Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims, as well as paragraphs 207 to 229 of their Thirteenth Affirmative Defense in their Answer, as if fully set forth herein.

16.     In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '985 patent.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 68 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

17.     As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas-American with regard to the validity of the '985 patent.

18.     A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights  with respect to the '985 patent.

19.     By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that at least claims 1, 3, 6, 7, and 12 of the '985 patent are invalid for failure to satisfy one or more conditions for patentability, including those set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

20.     By way of example only, claims 1, 3, 6, 7, and 12 of the '985 patent are invalid, *inter alia*, under 35 U.S.C. § 101 as unpatentable subject matter, and under 35 U.S.C. § 112 for indefiniteness.  As another example, claims 1, 3, 6, 7, and 12 of the '985 patent are invalid under 35 U.S.C. § 102 as anticipated by or otherwise unpatentable over, and under 35 U.S.C. § 103 as obvious over, at least the references identified in paragraphs 212-222 of this Answer, which paragraphs are incorporated herein by this reference.  These examples are preliminary and are not intended to limit Vestas Wind Systems and Vestas-American's ability to assert additional bases of invalidity.

## THIRD COUNTERCLAIM

### (Inequitable Conduct in Connection with the '985 Patent)

21.     Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims, as well as paragraphs 207 to 229 of their Thirteenth Affirmative Defense in their Answer to GE's SAC, as if fully set forth herein.

22.     In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '985 patent.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 69 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

23. As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas-American with regard to the enforceability of the '985 patent.

24. A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights with respect to the '985 patent.

25. By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that the '985 patent is unenforceable because it was obtained through inequitable conduct.

## FOURTH COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '705 Patent)

26. Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims as if fully set forth herein.

27. In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '705 patent.

28. As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas-American with regard to infringement of the '705 patent.

29. A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights with respect to the '705 patent.

30. By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that they do not infringe, either directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '705 patent, and are not liable for any alleged infringement of the '705 patent.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 70 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

## FIFTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '705 Patent)

31.     Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims, as well as paragraphs 79 to 206 of their Twelfth Affirmative Defense in their Answer, as if fully set forth herein.

32.     In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '705 patent.

33.     As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas-American with regard to the validity of the '705 patent.

34.     A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights with respect to the '705 patent.

35.     By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that at least claim 1 of the '705 patent is invalid for failure to comply with one or more conditions of patentability, including those set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

36.     By way of example only, claim 1 of the '705 patent is invalid, *inter alia*, under 35 U.S.C. § 101 as unpatentable subject matter, and under 35 U.S.C. § 112 for indefiniteness.  As another example, claim 1 of the '705 patent is invalid under 35 U.S.C. § 102 as anticipated by or otherwise unpatentable over, and under 35 U.S.C. § 103 as obvious over, at least the references, prior uses, sales, and offers for sale identified in paragraphs 86-119 of this Answer, which paragraphs are incorporated herein by this reference.  These examples are preliminary and are not intended to limit Vestas's ability to assert additional bases of invalidity.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 71 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

## SIXTH COUNTERCLAIM

### (Inequitable Conduct in Connection with the '705 Patent)

37.   Vestas Wind Systems and Vestas-American re-allege and incorporate by reference the allegations of the preceding paragraphs of these Counterclaims, as well as paragraphs 79 to 206 of their Twelfth Affirmative Defense in their Answer, as if fully set forth herein.

38.   In its SAC, GE has expressly accused Vestas Wind Systems and Vestas-American of infringing the '705 patent.

39.   As a result of GE's actions and statements, including the filing of the SAC, an actual and justiciable controversy exists between GE and Vestas Wind Systems and Vestas-American with regard to the enforceability of the '705 patent.

40.   A judicial declaration and determination is necessary and appropriate at this time given GE's allegations, and so Vestas Wind Systems and Vestas-American may ascertain their rights with respect to the '705 patent.

41.   By this Counterclaim, Vestas Wind Systems and Vestas-American seek a judicial declaration and determination that the '705 patent is unenforceable because it was obtained through inequitable conduct.

## COUNTERCLAIMS OF VESTAS WIND SYSTEMS

Vestas Wind Systems brings these additional counterclaims for patent infringement against GE, and alleges as follows:

## SEVENTH COUNTERCLAIM

### (Infringement of U.S. Patent No. 7,102,247)

42.   Vestas Wind Systems re-alleges and incorporates by reference the allegations of the preceding paragraphs of these Counterclaims as if fully set forth herein.

43.   On September 5, 2006, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 7,102,247 ("the '247 Patent"), entitled "Circuit

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 72 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

Arrangement and Methods for Use in a Wind Energy Installation."  A copy of the '247 Patent is attached as Exhibit 1.

44.     Lorenz Feddersen is the sole and true inventor of the '247 Patent.

45.     Vestas Wind Systems owns by assignment the entire right, title, and interest in and to the '247 Patent, including the right to seek damages and/or royalties for any past, current, or future infringement.  The '247 Patent has been in full force and effect since its issuance.

46.     The '247 Patent "provides a circuit arrangement for use in wind power installations having an asynchronous machine, by means of which more stringent requirements for modern wind power installations, in particular with regard to network stabilization, can be satisfied."

47.     The '247 Patent provides a "circuit arrangement for use in wind power installations" in which an "additional resistor can be controlled by means of a high-speed switch such that the converter can be at least temporarily switched off in the event of a network short circuit, in order for the rotor current to be taken over in the short term by means of the additional resistor, and can be connected to the network again."

48.     The '247 Patent explains that the circuit arrangement "allows the more stringent network requirements for network stabilization during operation of the wind power installation equipped with an asynchronous generator to be optimally satisfied, because no disconnection from the network takes place in this case in the event of a network short-circuit."

49.     On information and belief, GE has infringed and will continue to infringe at least claim 1 of the '247 Patent, literally or under the doctrine of equivalents, by making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, wind turbines that comprise the claimed circuit arrangement, including, but not limited to, the GE 2.75-120, 2.5-120, 2.75-100, 2.75-103, 2.85-100, 2.85-103, 3.2-103, 3.2-130, 3.4-130,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 73 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

and 3.4-137 turbines ("'247 Accused Products").  Vestas Wind Systems provides this preliminary, non-limiting identification of accused products based on public information.  For example, GE sold, offered to sell, tested, installed, and/or commissioned '247 Accused Products at the following wind farms: Alta Wind (California); Wind Colebrook South (Connecticut); Saddleback Ridge and Canton Mountain (Maine); Jericho Mountain (New Hampshire); Ringer Hill (Pennsylvania); and Goldthwaite (Texas).  On information and belief, GE has offered its 3.2-103, 3.2-130, 3.4-130, and 3.4-137 (collectively, "3.x") turbines for sale in the United States.  For example, GE has created North American versions of its 3.x turbines and has publicly announced their availability to customers in the United States.  On information and belief, GE has also entered into Master Supply Agreements with U.S. customers that cover its 3.x turbines.  On information and belief, GE has specifically offered its 3.x turbines to customers in South Dakota, Nebraska, and the U.S. Northeast for projects that are being planned in those regions.

50.    The '247 Accused Products embody every limitation of at least claim 1 of the '247 Patent, literally or under the doctrine of equivalents, as set forth below. The descriptions below, which are based on publicly available information, are preliminary and non-limiting.

***[1a] Circuit arrangement which is intended in particular for use in a variable rotation speed wind energy installation, comprising***

51.    The '247 Accused Products embody a circuit arrangement which is intended in particular for use in a variable rotation speed wind energy installation. For example, the '247 Accused Products are variable-speed wind turbines that generate electricity and are intended for use in a variable rotation speed wind energy installation (*e.g.*, a wind farm).

***[1b] a double-fed asynchronous generator,***

52.    The '247 Accused Products include doubly-fed, induction-type asynchronous generators.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 74 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1    *[1c] an additional resistor and*

2        53.    The '247 Accused Products include voltage protection circuits with a

3    resistor to dissipate power during network faults, including network short circuits,

4    and to prevent damaging sensitive components.

5    *[1d] a converter,*

6        54.    The '247 Accused Products include rotor converter systems with a

7    power module and associated electrical equipment.

8    *[1e] characterized in that the additional resistor can be controlled by means of a*

9    *switch such that the converter can be at least temporarily disconnected in the*

10   *event of a network short circuit, in order for the rotor current to be taken over in*

11   *the short term by means of the additional resistor and*

12       55.    In the event of a network fault, including a network short circuit, the

13   voltage protection circuit of the '247 Accused Products, which contains a resistor as

14   described above in paragraph 53, can be activated by means of a transistor.  The

15   transistor can cause the resistor to take over the rotor current and dissipate the

16   excess power, and the rotor converter can be temporarily disconnected while the

17   voltage protection circuit is activated.

18   *[1f] can be connected to the network again for active injection of a short-circuit*

19   *current after the rotor short-circuit current has decayed.*

20       56.    The rotor short-circuit current, which is the result of the generator

21   demagnetizing during a network fault, can decay quickly through the voltage

22   protection circuit.  After that current has decayed, the voltage protection circuit can

23   be deactivated and the rotor converter can be reconnected.  The '247 Accused

24   Products can then act as a controlled current source that supplies reactive current

25   into a network fault, including to help stabilize the network and to comply with grid

26   codes and other requirements.  For example, at least some of the '247 Accused

27   Products can supply a fault current at three times the rated current for a certain

28   period of time, after which the products return to their normal current contribution.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 75 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

57.   Thus, the '247 Accused Products meet each and every limitation of at least claim 1 of the '247 Patent.

58.   GE has had actual knowledge of the '247 Patent and its claims since at least April 23, 2007.  For example, the '247 Patent was cited during the prosecution of multiple GE patents related to controlling wind turbines during grid faults, including U.S. Patent Nos. 7,239,036 (cited by examiner on April 23, 2007); 7,253,537 (cited by examiner April 23, 2007); 7,276,807 (cited by examiner on June 28, 2007); 7,786,608 (cited by examiner on April 16, 2010); and 7,978,445 (cited by examiner on February 2, 2011).  In addition, GE also had actual knowledge of U.S. Patent Publication No. 2005/011,6476, which resulted in the '247 Patent, since at least September 2006, when members of GE's Grid Interconnection IP team listed, summarized, and analyzed it in a spreadsheet titled "Vestas Patents Grid Connect" that was circulated internally at GE.  DTX-276 (Dkt. 745.9 at 51, 56-57), *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, 946 F. Supp. 2d 582 (No. 3:10-cv-276) (N.D. Tex. 2013) (categorizing the '247 application under "Protection"); *MHI*, 946 F. Supp. 2d at 610 ("In September 2006—just weeks before the filing of the '705 application—McGinness received a spreadsheet used by the Interconnect IP team to identify key Vestas IP relating to grid connection" (citing DTX-276)).  GE created this spreadsheet as part of its efforts to identify key competitor prior art  in the field of grid interconnection.

59.   On information and belief, GE's infringement of the '247 Patent is and has been deliberate, willful, and egregious.  As detailed above in paragraph 58, despite having actual knowledge of the '247 Patent since at least April 23, 2007, GE has knowingly and intentionally made, sold, offered for sale, used, installed, and commissioned wind turbines that infringe the '247 Patent.

60.   On information and belief, GE has knowingly and intentionally induced infringement of the '247 Patent in violation of 35 U.S.C. § 271(b) by, for example, assisting and encouraging others, including without limitation, customers, wind

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 76 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

farms, and partner companies, to directly infringe the '247 Patent with respect to the making or using of the '247 Accused Products within the United States.  GE has, for example, controlled the design and manufacture of, offered for sale, sold, and otherwise provided instruction and guidance regarding the '247 Accused Products. As detailed above in paragraph 58, GE had actual knowledge of the '247 Patent and knew that it pertained to controlling and protecting wind turbines during grid faults. On information and belief, GE's customers directly infringe the '247 Patent by, for example, using and operating the '247 Accused Products in the United States.

61.    On information and belief, GE has contributed to the infringement of the '247 Patent in violation of 35 U.S.C. § 271(c) by, without authority, importing, selling, and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '247 Patent.  The '247 Accused Products, and components thereof, are a material part of the inventions of the '247 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.  As detailed above in paragraph 58, GE had actual knowledge of the '247 Patent and knew that it pertained to controlling and protecting wind turbines during grid faults.  On information and belief, GE knows that the Accused Products, and components thereof, constitute a material part of the inventions of the '247 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.

62.    As a result of GE's infringement of the '247 Patent, Vestas Wind Systems has suffered harm and will continue to suffer harm, including monetary damages.

63.    As a result of GE's infringement of the '247 Patent, Vestas Wind Systems has suffered irreparable harm and will continue to suffer irreparable harm unless and until GE's infringing activities are enjoined by this Court.

64.    On information and belief, this is an exceptional case warranting an award of attorney's fees to Vestas Wind Systems pursuant to 35 U.S.C. § 285.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 77 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

# EIGHTH COUNTERCLAIM

## (Infringement of U.S. Patent No. 7,859,125)

65.     Vestas Wind Systems re-alleges and incorporates by reference the allegations of the preceding paragraphs of these Counterclaims as if fully set forth herein.

66.     On December 28, 2010, the USPTO duly and legally issued U.S. Patent No. 7,859,125 ("the '125 Patent"), entitled "Method of Controlling a Wind Turbine Connected to an Electric Utility Grid."  A copy of the '125 Patent is attached as Exhibit 2.

67.     John Godsk Nielsen and Claus Esbensen are the sole and true inventors of the '125 Patent.

68.     Vestas Wind Systems owns by assignment the entire right, title, and interest in and to the '125 Patent, including the right to seek damages and/or royalties for any past, current, or future infringement.  The '125 Patent has been in full force and effect since its issuance.

69.     The '125 Patent provides a "method of controlling a wind turbine connected to an electric utility grid during [a] malfunction in the electric utility grid."

70.     The '125 Patent explains that "a modern variable speed wind turbine may sustain damage[] when the voltage of the utility grid suddenly disappears and it is not disconnected from the grid.  Damage may [be] sustained by a rapid raising voltage at the rotor side of the wind turbine generator or in the frequency converter."

71.     The '125 Patent "establishes a technique for controlling a wind turbine during severe malfunctions in an electric utility grid and without the above-mentioned disadvantage."  The method "allows a more flexible control of the protection means during grid failures where a vast number of different approaches may be chosen in dealing with the grid failure and the exact consequences hereof."

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 78 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

72.    On information and belief, GE has infringed and will continue to infringe at least claim 1 of the '125 Patent, literally or under the doctrine of equivalents, by using, testing, operating, making, offering to sell, and selling within the United States, and importing into the United States, without authority or license, wind turbines infringing the '125 Patent, including, but not limited to, the GE 2.75-120, 2.5-120, 2.75-100, 2.75-103, 2.85-100, 2.85-103, 3.2-103, 3.2-130, 3.4-130, and 3.4-137 turbines ("'125 Accused Products").   Vestas Wind Systems provides this preliminary, non-limiting identification of accused products based on public information.   For example, GE has sold, tested, installed, and/or commissioned '125 Accused Products at the following wind farms: Alta Wind (California); Wind Colebrook South (Connecticut); Saddleback Ridge and Canton Mountain (Maine); Jericho Mountain (New Hampshire); Ringer Hill (Pennsylvania); and Goldthwaite (Texas).   On information and belief, GE has offered its 3.2-103, 3.2-130, 3.4-130, and 3.4-137 (collectively, "3.x") turbines for sale in the United States.   For example, GE has created North American versions of its 3.x turbines and has publicly announced their availability to customers in the United States.   On information and belief, GE has also entered into Master Supply Agreements with U.S. customers that cover its 3.x turbines.   On information and belief, GE has specifically offered its 3.x turbines to customers in South Dakota, Nebraska, and the U.S. Northeast for projects that are being planned in those regions.

73.    Claim 1 of the '125 Patent is infringed when the '125 Accused Products are used, operated, tested, and/or installed.   The '125 Accused Products meet every limitation of at least claim 1 of the '125 Patent, literally or under the doctrine of equivalents, as set forth below.   The descriptions below, which are based on publicly available information, are preliminary and non-limiting.

***[1a] Method of controlling a wind turbine,***

74.    The '125 Accused Products are wind turbines.

***[1b] including an electric generator and***

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 79 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

75.    The '125 Accused Products include electric generators, including double-fed asynchronous generators.

**[1c] a power converter,**

76.    The '125 Accused Products include rotor converter systems with a power module and associated electrical equipment.

**[1d] connected to an electric utility grid during a malfunction in said grid, said method comprising,**

77.    The '125 Accused Products can remain connected to the electric utility grid during a malfunction in the grid, such as a low or zero-voltage event.  These functionalities are referred to by GE as "Low-Voltage Ride-Through" and "Zero-Voltage Ride-Through" features.

**[1e] detecting the malfunction in said electric utility grid, and**

78.    The '125 Accused Products are configured to remain connected to the grid during a particular set of grid faults that drop to a particular percentage of the nominal voltage for a particular duration.  To implement this functionality, the '125 Accused Products detect these malfunctions.  The '125 Accused Products do so by, for example, measuring a voltage inside the turbine.

**[1f] operating at least two control units of said power converter**

79.    The '125 Accused Products include two "dynamic brake" modules, including control hardware.

**[1g] in relation to at least one power converter limit value and at least one further value;**

80.    In the '125 Accused Products, the  two "dynamic brake" modules are operated in relation to at least one power converter limit value and at least one further value.  For example, in the '125 Accused Products, the power converter has a power converter limit for a maximum rated voltage permitted on the DC link.  In addition, the power converter also has one additional value, for example, the actual voltage measured on the DC link.  Control units including the "dynamic brakes" and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

- 80 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1  their control hardware are operated in relation to these actual and limit voltages in
2  order to prevent the actual voltage on the DC link from exceeding the limit value.

3  ***[1h] wherein said at least two units comprise a plurality of resistor blocks wherein***
4  ***each block includes at least one resistor and switch.***

5      81.   In the '125 Accused Products, control units including the "dynamic
6  brakes" comprise a plurality of resistor blocks.  The dynamic brakes include at least
7  one resistor connected to a terminal on the positive side of the DC link and a pair of
8  semiconductor switches.

9      82.   Thus, the '125 Accused Products embody each and every limitation of
10  at least claim 1 of the '125 Patent.

11      83.   GE has had actual knowledge of the '125 Patent since at least June 5,
12  2013.  For example, the '125 Patent was cited during the prosecution of multiple GE
13  patent applications relating to overvoltage protection and operation of wind turbines,
14  including U.S. Patent Nos. 8,975,768 (cited by GE on June 5, 2013); 9,312,682
15  (cited by GE on November 20, 2015); 9,231,509 (cited by GE on November 25,
16  2013); and 9,337,685 (cited by GE on February 17, 2014).  GE has also known of
17  U.S. Patent Publication No. 2009/007,9193 ("Nielsen '193"), which resulted in the
18  '125 Patent, since at least May 24, 2011, after the '125 Patent had already issued.
19  For example, Mitsubishi argued that Nielsen '193 raised a substantial new question
20  of the patentability of GE's '705 patent in its Request for *Inter Partes* Reexamination
21  on May 24, 2011 (Control No. 95/000,633).

22      84.   On information and belief, GE's infringement of the '125 Patent is and
23  has been deliberate, willful, and egregious.  As detailed above in paragraph 83,
24  despite having actual knowledge of the '125 Patent since at least June 5, 2013, and
25  likely much earlier, GE has knowingly and intentionally tested, used, installed, and
26  made wind turbines infringing the '125 Patent.

27      85.   On information and belief, GE has knowingly and intentionally induced
28  infringement of the '125 Patent in violation of 35 U.S.C. § 271(b) by, for example,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 81 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

assisting and encouraging others, including without limitation customers, wind farms, and partner companies, to directly infringe the '125 Patent with respect to the using, testing, and operating of the '125 Accused Products within the United States without authority or license.  GE has, for example, controlled the design and manufacture of, offered for sale, sold, advertised, and otherwise provided instruction and guidance regarding the '125 Accused Products with the knowledge and specific intent to encourage and facilitate infringing uses of those products by others.  As detailed above in paragraph 83, GE had actual knowledge of the '125 Patent and knew that it was directed to overvoltage protection and operation of wind turbines. On information and belief, GE's customers directly infringe the '125 Patent by, for example, using, operating, and testing the '125 Accused Products in the United States.

86.    On information and belief, GE has contributed to the infringement of the '125 Patent in violation of 35 U.S.C. § 271(c) by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '125 Patent both inside and outside the United States.  The '125 Accused Products, and components thereof, constitute a material part of the inventions of the '125 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.  As detailed above in paragraph 83, GE had actual knowledge of the '125 Patent and knew that it was directed to overvoltage protection and operation of wind turbines. On information and belief, GE knows and has known that the '125 Accused Products, and components thereof, constitute a material part of the inventions of the '125 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.

87.    As a result of GE's infringement of the '247 Patent, Vestas Wind Systems has suffered harm and will continue to suffer harm, including monetary damages.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 82 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

88.     On information and belief, this is an exceptional case warranting an award of attorney's fees to Vestas Wind Systems pursuant to 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Vestas Wind Systems and Vestas-American respectfully request the following relief:

(a)     That the Court issue a declaration that Vestas Wind Systems and Vestas-American have not infringed, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '985 patent;

(b)     That the Court issue a declaration that the '985 patent is invalid;

(c)     That the Court issue a declaration that the '985 patent is unenforceable;

(d)     That the Court issue a declaration that Vestas Wind Systems and Vestas-American have not infringed, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '705 patent;

(e)     That the Court issue a declaration that the '705 patent is invalid;

(f)     That the Court issue a declaration that the '705 patent is unenforceable;

(g)     That the Court enter judgment for Vestas Wind Systems that GE has infringed, and continues to infringe, the '247 and '125 Patents;

(h)     That the Court enter judgment for Vestas Wind Systems that GE has willfully infringed, and continues to willfully infringe, the '247 and '125 Patents;

(i)     That the Court enter judgment requiring GE to pay Vestas Wind Systems damages adequate to compensate it for GE's infringement of the '247 and '125 Patents;

(j)     That the Court enjoin GE, and its subsidiaries, parents, officers, directors, agents, servants, employees, affiliates, attorneys and all others in active concert or participation with any of the foregoing, from further acts of infringement of the '247 and '125 Patents, and award such other equitable relief as may be appropriate, including an enhanced ongoing royalty for all post-judgment infringement;

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 83 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)

1     (k)    That the Court award treble damages under 35 U.S.C. § 284;

2     (l)    That the Court determine that this is an exceptional case under 35 U.S.C. § 285 and award attorneys' fees and costs to Vestas Wind Systems and Vestas-American;

5     (m)    That the Court award Vestas Wind Systems prejudgment interest, post-judgment interest, and costs; and

7     (n)    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Vestas Wind Systems and Vestas-American demand a trial by jury on all issues on which trial by jury is available under applicable law.

DATED: January 22, 2018    By:    */s/ Amy E. Proctor*

Morgan Chu (Bar No. 70446)
mchu@irell.com
Gary N. Frischling (Bar No. 130583)
gfrischling@irell.com
Amy E. Proctor (Bar No. 283845)
aproctor@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:  (310) 277-1010
Facsimile:  (310) 203-7199

Attorneys for Vestas Wind Systems
A/S and Vestas-American Wind
Technology, Inc.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 84 -

ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT AND AMENDED COUNTERCLAIMS
Case No. 2:17-cv-05653 AB (PLAx)